Richard SERRA, Plaintiff,

v.

UNITED STATES GENERAL SERVICES ADMINISTRATION; Terrence C. Golden, Administrator, General Services Administration; William F. Sullivan, Commissioner, Public Buildings Service, General Services Administration; William J. Diamond, Regional Administrator (Region Two), General Services Administration, Officially and Individually; Dwight Ink, Former Acting Administrator, General Services Administration, Individually, Defendants.

No. 86 Civ. 9656 (MP).

United States District Court,
S.D. New York.

July 14, 1987.

Gustave Harrow, New York City, for plaintiff.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by Richard M. Schwartz, New York City, Joel C. Mandelman, Deputy General Counsel, U.S. General Services Admin., Washington, D.C., Barbara G. Gerwin, Regional Counsel, U.S. General Services Admin., Region 2, New York City, for defendants.

MILTON POLLACK, Senior District Judge.

Defendants in this case have moved, pursuant to Rules 12(b)(1), 12(b)(6) and 56 of the Federal Rules of Civil Procedure, to dismiss the complaint, or for summary judgment. In this Opinion, the Court will address the issue of whether defendants William Diamond and Dwight Ink, sued in their personal capacities (Diamond is also sued in his official capacity), are immune from personal liability under the doctrines of absolute and qualified immunity.

## BACKGROUND

In August 1979, the General Services Administration ("GSA") commissioned plaintiff Richard Serra to design an outdoor sculpture. The work was to be located on the plaza which is part of the building complex at 26 Federal Plaza in downtown Manhattan ("the Plaza"). Approximately 10,000 federal employees work in the building. In September 1979, the GSA formally entered into a contract with Serra which provided that the Government would pay Serra $175,000 for his sculpture. In early 1980, Serra submitted a design for his sculpture, called "Tilted Arc," to the GSA Design Review Panel. The sculpture, a 120 foot long, twelve foot high curving steel wall, was installed on the Plaza in July 1981. Generally speaking, the sculpture bisects the circular plaza. In December 1981, Serra executed a release in favor of the United States, "from any and all claims arising under or by virtue of [the Contract]." No claims were expressly reserved by Serra.

The 1979 contract provides, in part:
"ARTICLE 6. *Ownership*
All designs, sketches, models, and the work produced under this Agreement for which payment is made under the provisions of this contract shall be the property of the UNITED STATES OF AMERICA. All such items may be conveyed by the Contracting Officer to the National Collection of Fine Arts-Smithsonian Institution for exhibiting purposes and permanent safekeeping." (emphasis in original).

Plaintiff claims his work is "site-specific;" i.e. that it was intended specifically for the Plaza site. Serra alleges that he was given oral assurances by several GSA officials, before signing the contract, that his work would be permanently installed on the Plaza. Serra also represents that he asked about the meaning of Article 6, quoted above, of the contract. He claims that he was assured, at a meeting with several GSA officials on March 3, 1980, that this Article did not apply to his work. Serra says he was told that this section contained standard language that referred only to movable works, such as marble and bronze statues, providing for their safeguarding in times of national emergency.

Following installation of Tilted Arc on the Plaza, the GSA received complaints, including a September 1981 petition signed by approximately 1300 of the local federal employees, requesting that the work be removed from the Plaza. In late 1984, Acting GSA Administrator Ray Kline told defendant Diamond, administrator of the GSA region including New York, that the GSA had decided to hold an open public hearing on the controversial location and the possible relocation of Tilted Arc.

The complaint asserts that Diamond, during the period preceding the hearings, issued numerous false statements intentionally overstating the complaints against the sculpture, and pre-judging the issue. A December 29, 1984 newspaper article quoted Diamond as saying, "What we're deeply concerned about is the fact this this piece [i.e. Tilted Arc], for three and a half years, has made it impossible for the public and Federal community to use the Plaza." Diamond allegedly ordered that circulars be posted in the lobby of 26 Federal Plaza urging public employees to "Speak Out!" and announcing a public hearing on ways to more fully utilize the Plaza, including possible relocation of Tilted Arc. In December of 1984, defendant Diamond is said to have sought offers from various cultural institutions which might be interested in receiving Tilted Arc, should the GSA decide to relocate the sculpture.

Plaintiff claims that Diamond solicited over 1000 witnesses for the public hearing in a letter which stated that the hearing would decide whether the sculpture should be moved "to increase public use of the Plaza." Plaintiff claims that Diamond appeared on television during the hearings, and stated that when Tilted Arc was initially approved, "there was no idea the sculpture was going to bisect the plaza and make it practically impossible for any public function to be held in the plaza." Plaintiff further claims that Diamond induced a local community organization to urge removal of Tilted Arc.

Plaintiff states that Diamond named the members of the five-person Panel which presided over the public hearings, which were held on March 6–8, 1985, at 26 Federal Plaza. Diamond was the chairperson of the Panel. Plaintiff alleges that Diamond manipulated the hearing so as to have as many negative reactions as possible at the outset, thereby allegedly maximizing media coverage of these viewpoints.

More than 160 persons spoke at the hearings, running the gamut of reaction to the Serra sculpture. The three-day hearing was attended by persons of every persuasion, who made their views known. Plaintiff, his counsel, art experts, elected officials, community representatives, federal employees and every category of persons who had anything they wanted to say about the appearance of the Plaza before, during, and since the installation of the sculpture were heard. A verbatim transcript of the hearing was incorporated by reference in defendant's moving papers and gives a picture of the robust character of the debate which occurred there.

Following the hearing, defendant Ink, who had since become Acting Administrator of the GSA in place of Kline, requested that Diamond provide a written recommendation concerning the future of Tilted Arc. In a six page memorandum dated May 1, 1985, Diamond recommended to Ink that Tilted Arc be relocated and that the Plaza be returned to its former openness. He stated in the memorandum that the 1979 contract contained no guarantee of perma-

nency of location and that any such guarantee would be necessarily unworkable in application. Diamond's memorandum disputed that Serra's works were necessarily site-specific.

On May 31, 1985, Ink issued a 17–page decision, accompanied by several lengthy appendices, in which he stated that Tilted Arc should be relocated but not destroyed. Ink's written decision reviewed the testimony at the hearing both favoring and opposing removal of the sculpture. He stated that, while the artist had submitted models of his sculpture before it was accepted by GSA, the local community had not had sufficient opportunity to express its opinions at that time.

Enumerating the issues involved, Ink first concluded that relocation would not constitute a breach of contract because the contract contained no provision granting Serra any permanent property rights in the sculpture or in the area of the Plaza upon which it was affixed. While accepting that the work was specifically intended for the Plaza, Ink rejected the idea that this was a bar to removal. He stated that though Serra had designed the work for this site, that did not mandate that it remain there indefinitely. He also stated that relocation, even for a site-specific sculpture, would not be the equivalent of destruction. Ink concluded that relocation would neither threaten "freedom of art" nor would it threaten the future of the federal program for placing sculpture at federal sites. Ink ordered that a panel of the National Endowment for the Arts ("the NEA") convene to recommend alternative sites and that Tilted Arc should remain at the Plaza during the NEA search. In June 1986, the NEA announced the composition of the search panel. Defendants state that the NEA panel has not yet reported any recommendation to the GSA on alternate sites.

In December 1985, Serra filed a 72–page, five-count complaint, naming as defendants the GSA, its Administrator, its Commissioner of Public Buildings Service, and Diamond and Ink. Diamond is sued both "officially and individually," while Ink, who is no longer Administrator of the GSA, is sued only individually. The Complaint is organized in "groups of claims," which will be discussed as successive Counts.

Briefly, under Count One, Serra seeks a declaratory judgment that he has a contractual right to enforce his claim that Tilted Arc was to be permanently installed on the Plaza. Under Count Two, Serra seeks a declaratory judgment that relocation of Tilted Arc would violate his rights under federal copyright and trademark law. Plaintiff contends that display of Tilted Arc elsewhere would "misrepresent" the work as Serra's creation, when, in fact, Tilted Arc was intended by Serra to be exclusively exhibited at the Plaza.

In Count Three, Serra seeks a declaratory judgment that relocation of Tilted Arc would violate his Fifth Amendment rights by depriving him of his contract rights, damaging his reputation, and impairing his livelihood, without due process of law. Further, Serra states that relocation of the sculpture would violate his First Amendment rights by depriving him of "his right to artistic communication without governmental influence, interference, censorship or suppression." (Cplt. ¶ 205). Serra states that relocation "would be the equivalent of governmental destruction or tampering with the sole copy of an author's manuscript for reason of its content." (*Id.* at ¶ 211).

Under Count Four, Serra alleges constitutional torts against all defendants, including the claims against Diamond and Ink in their personal capacities which are at issue on this motion. These constitutional torts are based on alleged violations of the First and Fifth amendments. Serra contends that the negative publicity arising out of the controversy over Tilted Arc has generated significant hostility to his work. Serra states that his name and artistic reputation have been severely damaged in the United States and that he has sustained financial loss, severe emotional distress, and was, for a period of four months, unable to engage in his creative work. Serra seeks $10 million in special damages, $10 million in general damages, and $10 million in punitive damages.

Under Count Five, Serra seeks declaratory judgment that relocation of Tilted Arc would violate N.Y.Arts & Cult.Aff.Law § 14.03,[1] which states, in pertinent part:

"no person other than the artist or a person acting with the artist's consent shall knowingly display in a place accessible to the public or publish a work of fine art ... of that artist or a reproduction thereof in an altered, defaced, mutilated or modified form if the work is displayed, published or reproduced as being the work of the artist, or under circumstances under which it would reasonably be regarded as being the work of the artist, and damage to the artist's reputation is reasonably likely to result therefrom."

Serra cites allegedly similar statutes in California, Massachusetts and Maine, presumably on the theory that these laws would apply if the GSA decides to relocate Tilted Arc in one of these states.

## THE AUTHORITY OF THE GSA

The Government's authority to alter the appearance of federal property stems from the United States Constitution, which states in pertinent part: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3 cl. 2. Pursuant to this authority, Congress has enacted numerous statutes giving the GSA broad authority over the acquisition, maintenance and disposal of federal property. *See generally,* 40 U.S.C. ch. 3, 4, 6, 10, 12, 16. Specifically, the Administrator of the GSA is "authorized to operate, maintain, and protect any building owned by the United States." 40 U.S.C. § 490(b). Moreover, the Administrator is "authorized to alter any public building." 40 U.S.C. § 603(a). The statutory definition of "public building," in this context, includes the "grounds, approaches, and appurtenances" to such buildings. 40 U.S.C. § 612(1).

The congressional enactments do not prescribe any hearing requirement for the valid exercise of GSA's discretion. Nor is there any statutory requirement that managerial decisions of the GSA be subordinated to personal preferences, relating to location, of artists whose works have been purchased and installed on the grounds of a federal building.

## ABSOLUTE IMMUNITY

Under the doctrine of absolute immunity, there are some officials whose special functions require a full exemption from personal liability. For those government officials whose positions entitle them to absolute immunity, suits brought against them for personal liability for conduct which was within the scope of their duties must be dismissed. *See Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

The scope of absolute immunity is extremely limited, applying only to a narrow range of public officials. *See Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (the president); *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judges); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors); *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (legislators). It has been held that a member of the President's Cabinet is not entitled to absolute immunity. *Mitchell v. Forsyth,* 472 U.S. 511, 520–24, 105 S.Ct. 2806, 2812–15, 86 L.Ed.2d 411 (1985).

Defendants Diamond and Ink, while they are high officials in the GSA, obviously do not fit within any of the protected categories. However, they claim support for their argument for absolute immunity in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894. There, the Supreme Court held that "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be [absolutely] immune from suits for

---

1. Plaintiff's complaint cites §§ 14.53, 14.55 of the New York statute. These sections were repealed as of December 31, 1984. The relevant language is contained in § 14.03.

damages." *Id.* at 512–13, 98 S.Ct. at 2913–14. The Court noted that there is strong incentive for the loser in an administrative proceeding to "seek vengeance in the courts" by challenging the constitutionality of the proceeding and subjecting officials involved in the hearing to personal damage suits. The Court stated:

> "We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment. Because the legal remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal, we hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision." *Id.* at 516, 98 S.Ct. at 2916.

Here, Diamond initiated and presided over the public hearings on Tilted Arc. Diamond prepared a recommendation for Ink, who issued a formal decision committing the GSA to the relocation of Tilted Arc. Thus, at first glance, it would appear that Diamond and Ink might fall within the doctrine of absolute immunity for their roles in the GSA hearing process.

However, there are fundamental differences between the agency adjudicative process which the Court reviewed in *Butz* and the hearing process employed by the GSA regarding the Serra sculpture. The Court emphasized in *Butz* that "federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process." *Butz,* 438 U.S. at 513, 98 S.Ct. at 2914. The Court noted that under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, the proceedings are adversary in nature, and are conducted before a trier of fact insulated from political influence. The Court noted that an Administrative Judge can usually issue subpoenas and rule on proffers of evidence. In short, under *Butz,* the fundamentals of judicial proceedings must be provided to plaintiff before the courts will place the judicial officers involved totally beyond the reach of damages suits.

■ The process employed by GSA in this matter contained virtually none of these attributes. Here, the GSA's decision process was not conducted pursuant to the procedures of the Administrative Procedure Act. Most particularly, rather than being "conducted before a trier of fact insulated from political influence," *Butz,* 438 U.S. at 513, 98 S.Ct. at 2914, the hearings conducted by the GSA were presided over by Diamond, a political appointee, and his designates. There was no adversary process whereby both sides presented a case and were given rights of cross-examination. The hearing conducted by the GSA did not "share[ ] enough of the characteristics of the judicial process" such as to "enhance the reliability of information and the impartiality of the decisionmaking process [thereby resulting in] a less pressing need for individual suits to correct constitutional error." *Butz,* 438 U.S. at 512–13, 98 S.Ct. at 2913–14. Under these circumstances, this Court cannot conclude that Diamond and Ink, by virtue of their roles in the administrative decisionmaking regarding Tilted Arc, are cloaked with absolute immunity from suit.

### QUALIFIED IMMUNITY

For those government officials who do not fall into the narrow categories endowed with absolute immunity from suit, the Supreme Court has emphasized repeatedly that "qualified immunity represents the norm." *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982); *See Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("officials who act in ways they reasonably believe to be lawful ... should not be held personally liable."); *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (officials are immune unless "the law clearly proscribed the actions" they took); *Butz,*

438 U.S. at 508, 98 S.Ct. at 2912 ("a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations.").

The standard governing the application of the qualified immunity defense was laid out clearly in *Harlow:* "[G]overment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (citations omitted).

The standard is an objective one: "whether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.' No other 'circumstances' are relevant." *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017 82 L.Ed.2d 139 (1984) (citation omitted), *quoting Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Thus, on this motion, the question is not merely whether Diamond's or Ink's conduct violated constitutional standards. Rather, the question is whether, in participating in the decisionmaking process concerning possible relocation of Tilted Arc, Diamond and Ink violated constitutional standards which were *clearly established* at the time of their acts. If the nature of defendants' actions as managers of federal property was not unlawful under any clearly established constitutional doctrine, they are entitled to qualified immunity and to a dismissal from this suit in their personal capacities.

The Supreme Court has emphasized that the qualified immunity defense is meant to avoid "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737. Without such a rule, the business of government would rest on the degree of semantic accusation initiated by disaffected litigants intent on disrupting officials from their governmental duties.

More than the costs of trial, however, are at stake. The doctrine of qualified immunity results in "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815 (emphasis in original). Thus, courts should be especially careful not to let suits progress beyond the motion stage when a misty claim of constitutional violation is asserted in the absence of established, clearly identified constitutional law.

"On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. (citation omitted).

In *Anderson,* the Supreme Court provided a discussion of qualified immunity which is particularly relevant to the case at bar. The Court emphasized that a plaintiff may not defeat the qualified immunity defense "simply by alleging violation of extremely abstract rights.... The contours of the right [allegedly violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* —— U.S. at ——, 107 S.Ct. at ——.

The Court noted that it is not enough for a plaintiff to allege a violation of a clearly established standard in order to defeat a defendant's claim of *Harlow* immunity. Were this the case, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* This would defeat the pur-

pose of qualified immunity by "making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Id. citing Davis,* 468 U.S. at 195, 104 S.Ct. at 3019.

It is apparent that government officials who have a reasonable basis in law for their actions are not personally liable for damages under the *Harlow* standard, as amplified in *Anderson.* Diamond and Ink had several reasonable bases upon which to predicate their actions.

First, Both Diamond and Ink were familiar with the terms of the 1979 contract between the GSA and Serra. This contract expressly provided that Tilted Arc was the property of the U.S. Government. Moreover, in December 1981 Serra executed a general release, in favor of the United States, from any and all claims arising under and by virtue of the contract and sale of Tilted Arc. As high officials in the GSA, it was reasonable of Diamond and Ink to conclude that the Plaza, and Tilted Arc, were government property and that Diamond and Ink had statutory authority to manage the location and appearance of that property. *See* 40 U.S.C. §§ 471, 490, 603(a).

Second, there was (and is) no clearly established constitutional law, of which a reasonable person in defendants' position would have been aware, which Diamond and Ink violated by their actions regarding Tilted Arc. The Court will now consider seriatim the two constitutional claims made against Diamond and Ink herein.

### A. *First Amendment Claim*

Despite the voluminous papers already submitted in this case, plaintiff's First Amendment claim remains rather amorphous. Essentially, the claim appears to be that Tilted Arc, though purchased and bolted down on federal property by the GSA, is Serra's speech and that defendants Diamond and Ink unlawfully abridged that speech.

Much of the section of plaintiff's complaint which bears on the First Amendment issue details the allegedly false statements made by Diamond in allegedly stimulating hostile reactions to the Serra sculpture. However, plaintiff has pointed to no case in which a court ruled that a governmental official violates a citizen's First Amendment rights by criticizing the citizen's speech, whether the criticism is accurate or not.

Beyond this, Serra contends that relocation of Tilted Arc would constitute a First Amendment violation by "destroying" his work, which, he says, was solely intended to be viewed at the Plaza. That such a claim is not clearly established as constitutional doctrine is demonstrated by the number of novel legal questions it raises.

First, it is entirely unclear whether Tilted Arc, sold by Serra to the government and affixed to federal property, remains the speech of Serra so that he may complain of a First Amendment violation. Second, it is uncertain whether the Plaza is a public forum where Serra may assert a First Amendment right to display his sculpture on the Plaza. There is no indication in the record that the GSA freely allows access to the Plaza for artists wishing to display their works. "[P]roperty is not transformed into a 'public forum' merely because the public is permitted to freely enter and leave the grounds at practically all times and the public is admitted to the building during specified hours." *United States v. Grace,* 461 U.S. 171, 178, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). This is not a case in which public officials have deprived a citizen of enjoyment of the traditional "speaker's platform." The GSA bought and paid for Serra's sculpture and displayed it on the Plaza. This did not clearly establish the Plaza as a public forum such that Serra has a constitutional right to prevent the GSA from now altering the Plaza by removing Tilted Arc.

Third, it is not clearly established whether the GSA's decision to relocate the sculpture to another location is an unlawful abridgement of Serra's purported speech, given the congressional mandate to the GSA to maintain government property. Even where purported First Amendment rights are at issue, Government officials vested with management authority have

discretion to "make reasonable choices." *Lehman v. City of Shaker Heights*, 418 U.S. at 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (Court upheld a city regulation barring political advertisements on city buses). The plurality in *Lehman* held that this "managerial decision" did not rise to the dignity of a First Amendment violation. *Id.* at 304, 94 S.Ct. at 2718. Diamond and Ink could reasonably have concluded that, given their statutory authority to manage and alter federal property, their actions leading to the decision ultimately to relocate Tilted Arc constituted an appropriate and lawful "managerial decision."

Cases exist in other circuits in which a decision of governmental authorities to remove or relocate art exhibits was challenged on First Amendment grounds. In *Piarowski v. Illinois Community College*, 759 F.2d 625 (7th Cir.), *cert. denied*, 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985) the court considered a state college's decision to relocate a controversial art exhibit from a prominent ground-floor gallery to a less prominent fourth floor space. The gallery was not generally available to outsiders to display their work. Although artists were occasionally invited to display their work there, the court stated that this did not make the gallery a public forum. *Id.* 106 S.Ct. at 625. The court concluded that "relocation is not suppression," finding that the college's decision did not violate the artist's First Amendment rights. *Id.* 106 S.Ct. at 630.

Similarly, in *Close v. Lederle*, 424 F.2d 988 (1st Cir.), *cert. denied*, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970), the Court reversed a lower court's finding of a First Amendment violation when a State University removed a controversial art exhibit from a display corridor. *But see Sefick v. City of Chicago*, 485 F.Supp. 644 (N.D.Ill. 1979) (City's decision to remove a display which mocked the mayor violated the artist's First Amendment rights.).

■ The cases tend to support the proposition that government officials may relocate an artist's work from a designated location on government property without violating the artist's First Amendment rights. The cases do not support the proposition that Diamond and Ink's actions violated *clearly established* legal standards. However it is unnecessary and the Court, at this time, expresses no view on the ultimate disposition of the substantive questions remaining. The Court holds only that, under the circumstances of this case, there was no clearly established law to put a reasonable person, in Diamond or Ink's position, on notice that their conduct would constitute a First Amendment violation.

### B. *Due Process Claim*

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Thus, for Diamond and Ink to be stripped of their qualified immunity from suit, it must have been clearly established at the time they acted that Serra possessed a cognizable constitutional liberty or property interest in the location of Tilted Arc on the Plaza *and* that the procedure employed by the GSA in deciding to relocate the sculpture was deficient.

Plaintiff appears to claim a cognizable due process interest in his reputation, which was allegedly besmirched by false statements by Diamond and the relocation decision issued by Ink. Moreover, Serra alleges that the controversy over Tilted Arc has resulted in the loss of several employment opportunities.

The law clearly establishes that reputation alone is not a property interest which creates a due process claim for one defamed by a government official. *Paul v. Davis*, 424 U.S. 693, 705–06, 96 S.Ct. 1155, 1162–63, 47 L.Ed.2d 405 (1976) ("mere defamation of an individual [without] accompanying loss of government employment" is not actionable under due process.)

■ The deprivation of future government employment is, of course, a constitutionally protected property interest. *See*

*e.g. Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Serra asserts that he has suffered loss of employment due to the actions of Diamond and Ink. However, Serra was not a federal employee at the time the decision to relocate Tilted Arc was made. The relocation itself was not a "firing." Moreover, there is no allegation that the GSA has barred Serra from future employment by the federal government. Serra states only that several museums and galleries have postponed or delayed exhibitions of his work. He does not allege government blacklisting, but merely "sanctions applied by public disapproval." *Paul,* 424 U.S. at 703–04, 96 S.Ct. at 1161–62, *quoting Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 183–84, 71 S.Ct. 624, 654–55, 95 L.Ed. 817 (1951).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Where plaintiff remains as free as before to seek further employment, it "stretches the concept" of protectible due process interests to assert that defendants' actions deprived plaintiff of his right to due process. *Id.* at 575, 92 S.Ct at 2708. Serra remains free to seek government employment. The alleged damage to his reputation from the actions of Diamond and Ink does not state a clearly established cognizable due process interest.

More fundamentally, it certainly was not "clearly established" that Serra was entitled to more process than he was accorded. "The fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner.'" *Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986), *quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Here, the GSA conducted three days of public hearings in which more than 160 witnesses, including Serra and numerous others speaking in his behalf, were heard. This hearing occurred *before* any relocation of the Serra sculpture. Indeed, the case at bar, progressing with Tilted Arc still affixed to the Plaza, is still further evidence of the extensive predeprivation process which plaintiff has received.

## CONCLUSION

Plaintiff has alleged extremely abstract violations of constitutional rights. They have been alleged at an inadequate level of generality for the clear application of the relevant legal rules to the conduct of the moving defendants. *See Anderson,* —— U.S. at ——, 107 S.Ct. at ——. If the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the objective legal reasonableness that is the touchstone of *Harlow. Id.*

The constitutional claims present novel concepts and would constitute new restraints on the management of government property and the contractual commitments which may be made in connection therewith. It was entirely reasonable of Diamond and Ink to presume that the government may determine how it may manage and locate its property without thereby abridging any constitutional rights of anyone.

The purported constitutional issues raised by Serra go far beyond clearly established law.

Diamond's and Ink's actions were objectively reasonable in the context in which they acted. They are therefore entitled to the benefits of qualified immunity. The complaint against them in their personal capacity is accordingly dismissed, with costs to be assessed in their favor on final judgment.

So Ordered.