**Richard SERRA, Plaintiff,**

v.

**UNITED STATES GENERAL SERVICES ADMINISTRATION; Terrence C. Golden, Administrator, General Services Administration; William F. Sullivan, Commissioner, Public Buildings Service, General Services Administration; William J. Diamond, Regional Administrator (Region Two), General Services Administration, Officially and Individually; Dwight Ink, Former Acting Administrator, General Services Administration, Individually, Defendants.**

**No. 86 Civ. 9656 (MP).**

United States District Court,
S.D. New York.

Aug. 31, 1987.

---

**1044**

Gustave Harrow, New York City, for plaintiff.

Rudolph W. Giuliani, U.S. Atty. for the S.D.N.Y., by Richard M. Schwartz, New York City, Joel C. Mandelman, Deputy General Counsel, U.S. General Services Admin., Washington, D.C., Barbara G. Gerwin, Regional Counsel, U.S. General Services Admin., Region 2, New York City, for defendants.

MILTON POLLACK, Senior District Judge.

The defendants have moved to dismiss this suit pursuant to Rules 12(b)(1), 12(b)(6), and Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has countered with a motion pursuant to Rule 56 for partial summary judgment in his favor.

On July 14, 1987, this Court ruled that defendants William Diamond and Dwight Ink, sued in their personal capacities, are immune from personal liability herein under the doctrine of qualified immunity, 664 F.Supp. 798. Familiarity with that opinion is assumed.

The Court now considers the defendants' motion to dismiss the claims for alleged sovereign immunity and lack of subject matter jurisdiction, as well as insufficiency.

The papers hereon are of extraordinary length, and consist of over 1000 pages of materials in the form of affidavits, briefs, and a 655 page transcript of a public hearing. A brief summary of the background of this case will be useful.

## BACKGROUND

A simple purchase was made in 1979 by the United States General Services Administration ("GSA") for the Government of a piece of outdoor sculpture in the form of a 120–foot long piece of steel, 12 feet tall, weighing 73 tons, titled "Tilted Arc". The item cost the Government $175,000 and was to adorn the Federal Plaza, which is a part of, and adjoins the 41 story government building located in lower Manhattan, on the block surrounded by Worth, Lafayette, and Duane Streets and Broadway. The sculpture cuts a swath across the center of Federal Plaza, dividing it in two.

The GSA commissioned Richard Serra, the plaintiff, to design and install the sculpture. The parties entered into a written contract which provides that "All designs, sketches, models, and the work produced under this agreement ... shall be the property of the United States of America." On

December 2, 1981, after completion of his assignment, Serra executed a general release in favor of the United States releasing it from any and all claims arising under or by virtue of the Contract or any modification or change thereof.

The written contract also contained a Disputes clause providing, in pertinent part, as follows:

12. DISPUTES

(a) This contract is subject to the CONTRACT DISPUTES ACT of 1978 (41 U.S.C. 601, *et seq.*). If a Dispute arises relating to the Contract the Artist may submit a claim to the Contracting Officer who shall issue a written decision on the Dispute in the manner specified in DAR 1–314 (FPR 1–1.318).

Serra has never submitted a claim pursuant to the Dispute clause to the Contracting Officer.

Serra contends that in addition to the written contract he made an oral arrangement with GSA providing that the sculpture would be permanently displayed on Federal Plaza and that this commitment must be recognized in this suit.

The Government has decided to relocate Tilted Arc away from Federal Plaza and that decision has sprouted this lawsuit against GSA and those of officialdom connected with the subject matter. Serra seeks a declaratory judgment that he designed the sculpture to be "site specific" to Federal Plaza and made a contract with GSA that it would not be removed from Federal Plaza. Moreover, he says, relocation of the piece to any other site would violate his constitutional rights. Serra seeks a permanent injunction against any relocation. He also demands special damages of $10,000,000; general damages of $10,000,000; further unspecified general damages to be proven at the trial; and punitive damages of $10,000,000 against all defendants, as well as costs, expenses and legal fees.

The sculpture was installed on Federal Plaza in July, 1981. A considerable number of complaints concerning the presence of the work were received almost immediately by GSA. These complaints characterized the location of the sculpture as an obstruction of the Plaza. In November 1984 Chief Judge Re, whose court is located in the building adjacent to the Plaza, sent a letter to the GSA calling for "instant removal" of Tilted Arc. The Judge wrote: "we who work here are left with a once beautiful plaza rendered useless by an ugly rusted steel wall".

By that time the controversy over the location of the sculpture had become full blown among users of the Plaza, federal employees in the building and their agencies, art afficionados, local organizations and Community Boards, political representatives, and others. Heated expressions of opinion, pro and con, proliferated on the location of Tilted Arc. One group claimed that the sculpture had destroyed the previously open plaza by obstructing free passage across the plaza and blocking an open view of the fountain; that it constitutes a scar on the Plaza and creates a fortress-like effect; that it is a target for graffiti; and that it is too large for its present site and violates the very spirit and concept of a plaza.

Others pointed to the sculpture as a message essentially expressing a commitment of our country to artistic expression as a vital element of our culture through the utilization of appropriated funds for this purpose and as a form of freedom for the artist to make his statement about the life and times in which the artist lives and works; and as an expression of the deepest values of our society.

Following a canvass of the contentious situation including a broad scale public hearing gathered after the distribution of 1000 invitations to attend and where the rival viewpoints were prolifically ventilated, GSA determined on the administrative record that Tilted Arc should be relocated in a location more compatible to its surroundings, restoring Federal Plaza to its original open, unobstructed state.

GSA selected the National Endowment for the Arts to search for a suitable location for the sculpture with the aid of the artist and requested that it make a recom-

mendation to the Administrator of GSA. The composition of a panel to review proposed sites was announced on June 24, 1986. This action was instituted on December 17, 1986.

The complaint herein is cast in multiple claims: breach of contract; copyright violation; trademark violation; and violation of state statutory law. The claims further assert violation of Serra's First and Fifth Amendment rights by the planned relocation.

The copyright claim recites that any relocation would constitute a fundamental alteration and distortion of the work and violate Serra's rights as copyright owner and that he has not consented to exhibit the sculpture in a modified form.

The trademark claim recites that relocation would constitute a misrepresentation of Serra's artistic authorship, and misrepresent the source and quality of the work.

Serra has asserted in his papers on these motions that his lawsuit has two objectives:

1. To enjoin the Government from withdrawing from what he claims was an oral understanding to preserve Tilted Arc at its site on Federal Plaza. Since, as he argues, any removal would necessarily have to be predicated on negative judgments of the artistic expression of the work and on its aesthetic, social and political meaning, a removal in violation of the claimed contract would violate the First and, ultimately, the Fifth Amendment to the Constitution.

2. To recover damages for the alleged constitutional torts involved.

## I.

## JURISDICTION AND SOVEREIGN IMMUNITY

This Court lacks jurisdiction to administer the plaintiff's contract, copyright, trademark, and state law claims because the United States has not waived its sovereign immunity.

Under the doctrine of sovereign immunity, "it is axiomatic that the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); *see Block v. North Dakota,* 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983); *Sprecher v. Graber,* 716 F.2d 968, 973 (2d Cir. 1983). Where Congress has not passed a statute allowing a particular type of suit to proceed, the federal courts have no jurisdiction to hear that type of suit. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941) ("the terms of [the United States'] consent to be sued in any court define the court's jurisdiction to entertain the suit.").

Moreover, "the limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman v. Nakshian,* 453 U.S. 156, 161, 101 S.Ct. 2698, 2702, 69 L.Ed.2d 548 (1981), *quoting Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). *See, e.g., Minnesota v. United States,* 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939) (strict limitations on which courts may hear particular suits); *United States v. Bedford Associates,* 618 F.2d 904, 917 (2d Cir.1980) ("With regard to suits in the district courts, the government's consent has definite limitations," noting the restrictions of the Tucker Act).

Here, Serra has not sued the United States directly. He has named as defendants a government agency, the GSA, and three senior GSA officials, each sued in his official capacity.[1] The same principles of sovereign immunity which would apply to a suit against the United States apply to a suit against a government agency, because the United States is the real party in interest. *See Helash v. Ballard,* 638 F.2d 74, 76 (9th Cir.1980) (per curiam); *Matranga v. Travelers Ins. Co.,* 563 F.2d 677,

---

**1.** Claims against two GSA officials for liability as individuals were dismissed by the prior opinion. One of these officials, William J. Diamond, remains as a defendant in his official capacity.

677–78 (5th Cir.1977) (per curiam). Only where Congress has given explicit authority for a federal agency to be sued *eo nomine* may such a suit be maintained. *Blackmar v. Guerre,* 342 U.S. 512, 514–15, 72 S.Ct. 410, 411–12, 96 L.Ed. 534 (1952). No such authorization has been legislated for suits against the GSA. *Kessler v. General Services Admin.,* 341 F.2d 275, 276 (2d Cir.1964) (per curiam).

■ As to the individual defendants, the suit will still be regarded as one against the United States where, as here, the relief sought would interfere with the public administration, expend itself on the public treasury, or if the effect of a judgment in plaintiff's favor would be to restrain the government from acting, or to compel it to act. *Dugan v. Rank,* 372 U.S. 609, 620–21, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1963); *cf. Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947).

■ There can be no doubt that the claims against the GSA officials are actually claims against the United States. The principal relief sought by Serra is an injunction preventing the Government from effecting its decision to relocate Tilted Arc. The location of such government property is a matter of public administration, not within the personal province of the three individual defendants. *See Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963) ("relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter."); *Uve Gustavsson Contracting Co. v. Floete,* 278 F.2d 912, 914 (2d Cir.), *cert. denied,* 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960) ("A request for a declaratory judgment upon a contract to which the government is a party is plainly a request for relief against the United States.")

There are two exceptions in the law to the application of sovereign immunity. These relate to: "(1) actions by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." *Dugan,* 372 U.S. at 621–22, 83 S.Ct. at 1007; *Larson,* 337 U.S. at 701–02, 69 S.Ct. at 1467. Neither of these exceptions applies to the actions by the GSA officials.

As this Court stated in its previous opinion, "Congress has enacted numerous statutes giving the GSA broad authority over the acquisition, maintenance and disposal of federal property." *Serra v. GSA,* 664 F.Supp. 798, 802 (S.D.N.Y.1987). This statutory authority is broad enough to cover defendants' actions. *See infra,* at p. 1052. Moreover, the powers of the GSA officials, and the manner in which they were exercised, were not constitutionally objectionable. As this Court rules today, the government's decision to relocate Tilted Arc did not violate either Serra's First Amendment or Fifth Amendment rights.

In summary, plaintiff's suit is one against the United States and neither the plaintiff's choice of defendants nor the acts of the GSA officials named remove this suit from the rule that this Court may not hear this action since the government has not expressly consented thereto.

### A. The Contract Claim

Plaintiff has noted two statutes by which, he claims, the government has consented to district court jurisdiction over the contract claim against it, thereby waiving sovereign immunity. The Tucker Act provides a consent of the United States to be sued in the district court on "Any other civil action or claim against the United States not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress ... or upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2).

However, that limited grant of jurisdiction to the district courts over contract claims was withdrawn in 1978 by the Contract Disputes Act, 41 U.S.C. §§ 601–613 ("CDA"), which expressly excluded from the jurisdiction of the district courts "any civil action or claim against the United

States founded upon any express or implied contract with the United States ... which are subject to sections 8(g)(1) and 10(a)(1) of the [CDA]." 28 U.S.C. § 1346(a)(2).

Section 8(g)(1) of the CDA provides that the decision of an agency board of contract appeals shall be final except that such decision may be appealed by either side to the Court of Appeals for the Federal Circuit. 41 U.S.C. § 607(g)(1). Section 10(a)(1) states that, in lieu of appealing the initial decision of the contracting officer, a contractor may bring an action directly in the United States Claims Court. 41 U.S.C. § 609(a)(1).

Before the passage of the CDA, the United States was not subject to suit in the district courts over a breach of a federal contract unless damages of no more than $10,000 were sought. By enactment of the CDA, the district court jurisdiction over damage claims of less than $10,000 was removed. *Chemung County v. Dole,* 781 F.2d 963, 967 (2d Cir.1986).

The CDA was enacted to simplify the "needless complexity" which had previously governed the adjudication of claims by federal contractors. This legislation was intended to "[e]mpower contracting agencies to settle and pay, and administrative forums to decide, all claims or disputes arising under or growing out of or in connection with the administration or performance of contracts entered into by the United States." *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 645 F.2d 966, 972 (1981), *quoting* 4 Report of the Commission on Government Procurement 15 (1972); *see Great Lakes Educational Consultants v. Federal Emergency Management Agency,* 582 F.Supp. 193, 195 (W.D. Mich.1984).

In determining that claims by contractors should be resolved administratively, the CDA "remov[ed] jurisdiction of the district courts over actions or claims against the United States, regardless of the amount in controversy, when such actions are founded upon an express or implied in

fact contract with the federal government." *Chemung County,* 781 F.2d at 967; *McDonnell Douglas Corp. v. United States,* 754 F.2d 365, 370 (Fed.Cir.1985).

As Judge (now Justice) Scalia recently stated:

> "The sole remedy for an alleged breach of contract by the federal government is a claim for money damages ... we know of no case in which a court has asserted jurisdiction either to grant a declaration that the United States was in breach of its contractual obligations or to issue an injunction compelling the United States to fulfill its contractual obligations." *Sharp v. Weinberger,* 798 F.2d 1521, 1523–24 (D.C.Cir.1986).

Under the CDA, the administrative process requires that: "all claims by a contractor against the government shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). A "contractor" is any party who has entered into a contract with the United States. 41 U.S.C. § 601(4). The "contracting officer" is the person designated by the government as having "authority to enter into and administer contracts and make determinations and findings with respect thereto."[2] 41 U.S.C. § 601(3). The CDA applies, with exceptions not here relevant, "to any express or implied contract ... entered into by an executive agency for (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property" 41 U.S.C. § 602(a).

█ Serra asserts that he has made no contractor's claim under the CDA, and states that, because his claim is for nonmonetary damages, it is not subject to the CDA. He states that the Claims Court, which has jurisdiction to hear government contract claims under the CDA, cannot grant the injunctive relief he seeks. However, a plaintiff may not sidestep the restrictions of the CDA merely by avoiding a

---

**2.** The Serra-GSA contract designated the government official who executed the document as

"contracting officer."

request for damages. Even if the Claims Court were unable to grant the relief plaintiff seeks, Congress has directed that it is the only court empowered to hear contract suits against the United States. *Ingersoll-Rand Co. v. United States,* 780 F.2d 74, 79–80 (D.C.Cir.1985); *Consumers Solar Power Corp. v. United States Postal Service,* 530 F.Supp. 702, 706–07 (C.D.Cal. 1982).

Serra, having executed a contract with the United States is a "contractor" for the purposes of the CDA. His contract claim arises from that very contract, and is therefore "subject to" the CDA. 41 U.S.C. § 605(a). Moreover, as has already been mentioned, the contract between Serra and the GSA, signed by Serra and witnessed by his attorney, provided explicitly that the contract is subject to the CDA, even giving statutory references to the CDA and to the federal regulations which govern the details of submission of contract claims under the CDA.

Plaintiff's second attempt to find a waiver of sovereign immunity is centered on the Administrative Procedure Act (APA), particularly 5 U.S.C. §§ 702, 704, in combination with the general federal jurisdictional statute, 28 U.S.C. § 1331. The APA is not an independent jurisdictional provision. *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). As a threshold matter, this Court does seemingly have jurisdiction over plaintiff's contract claim under 28 U.S.C. § 1331, by reason of the grant to the federal courts of original jurisdiction over actions "arising under" the Constitution, laws, or treaties of the United States. Claims over contracts with the United States are generally governed by federal common law. *North Side Lumber Co. v. Block,* 753 F.2d 1482, 1486 (9th Cir.), *cert. denied,* 474 U.S. 931, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985); *Clem Perrin Marine Towing v. Panama Canal Co.,* 730 F.2d 186, 189 (5th Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984). Federal common law is a part of federal law for the purposes of "arising under" jurisdiction pursuant to 28 U.S.C. § 1331. *Illinois v. Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972).

■ However, 28 U.S.C. § 1331 is not a general waiver of sovereign immunity. *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 724 (2d Cir.1983). Thus, unless it can be found that the APA expressly waives sovereign immunity applicable to Serra's suit, this Court is without jurisdiction to hear it. As we later show, the waiver contained in the APA does not apply to this suit.

■ Section 702 of Title 5 states, in pertinent part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. . . . The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

Section 702 provides a general waiver of sovereign immunity for actions which do fall within its scope. *B.K. Instrument,* 715 F.2d at 724–25. Plaintiff urges that § 702 waives the defense of sovereign immunity as to his contract claim since he is aggrieved by agency action and his suit is against agency officials whose administrative actions are subject to judicial review. Section 702 was amended in 1976, with the purpose "to remove the defense of sovereign immunity as a bar to judicial review of federal administrative action *otherwise subject to judicial review.*" *B.K. Instrument,* 715 F.2d at 724, *quoting* legislative history, *reprinted* in 1976 U.S.Code Cong.

& Ad.News 6121 (emphasis added). However, the last sentence of § 702 makes waiver of sovereign immunity inapplicable to this species of case because the Tucker Act, as amended by the CDA, fulfills the final exclusionary clause of § 702 in that it is "a statute which grants consent to suit [and] expressly or implicitly forbids the relief which is sought."

Plaintiff asserts that the limited waiver of sovereign immunity provided by the Tucker Act, as amended by the CDA, does not deprive him of the waiver of sovereign immunity provided by § 702 because the jurisdiction of the Claims Court does not include the power to award the non-monetary damages which he seeks. *See Glidden Co. v. Zdanok,* 370 U.S. 530, 557, 82 S.Ct. 1459, 1476, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J.). Plaintiff is correct in his observation that specific performance on a government contract is not available in the district court. The Supreme Court gave a resounding explication of this policy in *Larson:*

> It is argued that the principle of sovereign immunity is an archaic hangover not consonant with modern morality and that it should therefore be limited wherever possible. There may be substance in such a viewpoint as applied to suits for damages.... But the reasoning is not applicable to suits for specific relief. For, it is one thing to provide a method by which a citizen may be compensated for a wrong done to him by the Government. It is a far different matter to permit a court to exercise its compulsive powers to restrain the Government from

acting, or to compel it to act. There are the strongest reasons of public policy for the rule that such relief cannot be had against the sovereign. The Government, as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right. 337 U.S. at 703–04.

While § 702 of the APA did remove the defense of sovereign immunity in many actions against agency officials, it did not change the long-standing rule that the government has only consented to suit on contract actions as provided by the Tucker Act, as amended by the CDA. The Tucker Act provides exclusive federal jurisdiction, but not in the district court, for contract actions against the United States and, whatever its limitations, represents the judgment of Congress that contract actions may be brought against the United States, but only as provided for in that statute. *See Sharp v. Weinberger,* 798 F.2d 1521, 1523 (D.C.Cir.1986) (Scalia, J.); *North Side Lumber,* 753 F.2d at 1485; *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 433 (3d Cir.1979); *American Science and Engineering, Inc. v. Califano,* 571 F.2d 58, 62–63 (1st Cir.1978); *Alabama Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1225–26 (5th Cir.1976).[3]

■ Plaintiff briefly refers to § 704 of the APA, which provides that "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Such a review, of course, presupposes an exhaus-

---

3. Even assuming, *arguendo,* that this Court has jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. § 1331 to review the actions of the agency allegedly constituting breach of GSA's contractual obligations to plaintiff, the standard of review is whether the agency has acted in a manner which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[A] court may not substitute its judgment for that of the agency." *Chemung County,* 781 F.2d at 971.

Based upon the foregoing standard of review, the findings in the Ink Decision with respect to the discretionary execution of the GSA's policies and practices with respect to procurement and GSA's managerial decisions relating to federal

property and buildings are entitled to great weight. There is no acceptable evidence in the record on which to consider faulting that exercise of discretion. In reaching the conclusion that a new location for Tilted Arc should be sought, the Administrator reasonably concluded that the "primary mission of the GSA public building program is to provide suitable housing for Federal employees and the servicing of the general public." This overriding purpose is consistent with and reflects GSA's statutory responsibilities to manage and maintain federal property and buildings in the best interests of the public. *See e.g.,* 40 U.S.C. § 490(b). However, the Court need not rely on this point for a proper decision herein.

tion of administrative remedies, such as are provided for by the CDA. Plaintiff has pointed to no authority, and this Court is aware of none, which has held that § 704 can serve as a general waiver of sovereign immunity. At all events, Congress, through the Tucker Act, as amended by the CDA, has deemed the Court of Claims, despite whatever limitations exist as to the relief it may grant, to be the "adequate remedy" for plaintiffs suing the United States over a federal contract. *American Science and Engineering*, 571 F.2d at 62 ("review by the Court of Claims has consistently been held to provide an adequate remedy for an alleged breach of contract by a federal agency"); *Alabama Rural Fire Insurance*, 530 F.2d at 1230 (same, citing cases).[4]

Consequently, the Tucker Act as amended by the CDA satisfies the exclusionary clause of the APA. The Tucker Act, as amended, both expressly and impliedly forbids the relief that Serra seeks from this Court. Accordingly, this Court is devoid of jurisdiction over plaintiff's contract claim.

### B. The Copyright Claim

■ The only possible waiver of sovereign immunity for plaintiff's copyright claim would be that found in the APA. Again, however, the last sentence of § 702 makes that waiver inapplicable to Serra's copyright claim since there is a statute which grants consent to suit but expressly forbids jurisdiction in the district court for the relief which is sought, *viz:*

> Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States ... the exclusive remedy of the owner of such copyright shall be by action against the United States in the Claims Court for the recovery of his reasonable and entire compensation as damages for such infringement. 28 U.S.C. § 1498(b)

Section 1498 grants consent against the United States to suits for patent and copyright actions against it, but limits relief only to that obtainable in the Claims Court. *See Zimmerman v. United States*, 422 F.2d 326, 328 (3d Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 (1970); *Identification Devices, Inc. v. United States*, 121 F.2d 895, 896 (D.C.Cir.) (Rutledge, J.), *cert. denied*, 314 U.S. 615, 62 S.Ct. 63, 86 L.Ed. 495 (1941); *Leesona v. United States*, 198 U.S.P.Q. 4, 14 (Ct.Cl. 1978), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

### C. The Trademark Claim

■ No statute of the United States contains a consent from the United States that it may be sued for trademark infringement. Under the doctrine of sovereign immunity, which requires any waiver to be explicit, the trademark claim must be dismissed.

■ Furthermore, the mark of the sculpture "Tilted Arc" is not at issue in this case. The site of the sculpture is distinct from the name of the art; the name is not in controversy. The identifying mark of the art in any relocated site would remain the same. The purpose of a trademark is to give notice of who was the producer of the art. No action of the government threatens the identification of Serra with Tilted Arc. There is no such thing as an abstract trademark apart from the work that the artist created; he can claim no trademark rights in the surroundings of the Plaza. Where a device, mark, or symbol is adopted for any purpose other than as a reference to, or indication of, its ownership or creation, it cannot be sustained as a valid trademark. *Columbia Mill Co. v. Alcorn*, 150 U.S. 460, 463, 14 S.Ct. 151, 152, 37 L.Ed. 1144 (1893).

### D. State Law Claim

New York law prohibits the public display of an artwork "in an altered, defaced,

---

**4.** In his complaint, plaintiff cites the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 as a possible source of jurisdiction; the Declaratory Judgment Act does not waive sovereign immunity. *Thomas v. Pierce*, 662 F.Supp. 519 (D.Kan.

1987); *United States v. Nicolet, Inc.*, slip op. (E.D.Pa. December 31, 1986) [Available on WESTLAW, DCT database]; *Benvenuti v. Department of Defense*, 587 F.Supp. 348, 352 (D.D. C.1984), *aff'd*, 802 F.2d 469 (Fed.Cir.1986).

mutilated or modified form ... without the artist's consent." N.Y.Arts & Cult. Aff.Law § 14.03.

Since this Court this day holds that no federal jurisdiction is presented by any of plaintiff's other claims, this Court, in the exercise of its discretion will not take jurisdiction over the state-created claim. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

## II.

### ALLEGED CONSTITUTIONAL VIOLATIONS

#### A. The Authority of the GSA

The Government's authority to alter the appearance of federal property stems from the United States Constitution, which states in pertinent part: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3 cl. 2. Pursuant to this authority, Congress has enacted numerous statutes giving the GSA broad authority over the acquisition, maintenance, and disposal of federal property. *See generally*, 40 U.S.C. ch. 3, 4, 6, 10, 12, 16. Specifically, the Administrator of the GSA is "authorized to operate, maintain, and protect any building owned by the United States." 40 U.S.C. § 490(b). Moreover, the Administrator is "authorized to alter any public building." 40 U.S.C. § 603(a). The statutory definition of "public building," in this context, includes the grounds, approaches, and appurtenances" to such buildings. 40 U.S.C. § 612(1).

#### B. Serra's Constitutional Claims

Serra contends that (1) Tilted Arc is constitutionally protected expression, and the government's actions are constrained by the First Amendment to the Constitution; and (2) the government's actions were in violation of the procedural due process requirements of the Fifth Amendment.

The constitutional issues presented are separate and apart from the alleged contractual commitment; the latter has already been dealt with above as a jurisdictional matter.

The constitutional claims are thus predicated on the following contentions by plaintiff:

1. The sculpture, as artistic expression, communicated philosophical, social and political meanings;

2. The decision to relocate Tilted Arc was based upon reactions to its artistic expression, in part because these meanings, for some, caused anxiety or discomfort;

3. There was no factual or expert support for Diamond's and Ink's conclusion that Tilted Arc is not "site specific."

4. Removing or relocating Tilted Arc negates, and therefore destroys, its artistic expression.

#### C. The Proceedings to Relocate Tilted Arc

In late November or early December 1984, William J. Diamond, the Region 2 (Local) Administrator of GSA met in Washington with Donald W. Thalacker, Director of the Art-In-Architecture Program. That program involves the procurement and placement of art in public buildings. At that meeting, Diamond expressed his intention to convene a public hearing to consider the relocation of Tilted Arc.

About December 5, 1984, Thalacker telephoned Serra to inform him of the planned public hearing and to urge Serra to speak at the hearing. Serra agreed to speak. In a *New York Times* article of December 29, 1984 Diamond was quoted as saying "This is not an attack on the esthetics of the artist ... This piece, for three-and-a-half years, has made it impossible for the public and Federal community to use the Plaza." On February 3, 1985, Diamond was quoted as saying, "At the time [of installation] the impact on the site wasn't really understood."

One thousand letters were mailed over Diamond's signature inviting the recipients to attend the public hearing. He stated that the purpose of the hearing was to

encourage input by the federal community, the arts community and the public at large as to whether Tilted Arc should be relocated "to increase public use of the Plaza." Circulars were posted in areas surrounding Tilted Arc headlined "Speak Out!" These flyers announced a public hearing on "Ways to More Fully Utilize the Plaza."

Petitions were placed in the lobby of the Federal Office Building to be signed by those "For Relocation," and "Against Relocation." More than one thousand forms were signed in favor of the relocation. Some 68 persons are recorded as having spoken at the three-day public hearing. The debate was robust and spirited with all points of view expressed. As a result of the hearings there were documented 654 pages of testimony, 7,412 petitions, and 1,779 letters either for or against the relocation of the sculpture.

### D. The Local Administrator's Report

On April 23, 1985 Dwight Ink, the Acting Administrator of GSA, located in Washington, D.C., requested a written recommendation of Diamond, the Local Administrator, concerning whether Tilted Arc should be relocated. The report was intended to enable Ink to study the administrative record, including the statements given at the three-day public comment session held in New York, and to assist him in making a decision. Diamond complied on May 1, 1985. His recommendation and reasons were substantially as follows.

Tilted Arc had engendered intense controversy since its installation, when 1300 persons signed a petition protesting its presence. During the following years the criticism of the location of the piece had become even more intense; at the public hearing in March, 1985 over 4,500 letters and petitions urged the relocation of the Tilted Arc. Frequently, these requests asked for the return of the plaza to the original concept envisioned by its architects and designers of a "fine pedestrian amenity where in pleasant weather it would serve as a resting place to eat lunch or bask in the sun." Others in the area expressed the purpose of relocation as "to regain the openness of the plaza for the benefit of their governmental missions ... major events [t]heretofore held in the open plaza ... have been diverted to other locations or have been drastically reduced in scope so as to be able to fit within the confines of the 26 Federal Plaza building." It is "physically impractical to use the plaza for the same public beneficial purposes as was done prior to its installation ..." "I [Diamond] decided that I am not in a position to make any evaluation as to the artistic merit of the piece; that is for the art community and future generations."

The Manhattan Community Board #1, representing more than 250,000 residents of lower Manhattan, voiced its unanimous recommendation for relocation to a more suitable site because "the sculpture obstructs most of the open space at the Federal Plaza ... We cannot simply turn our backs on our pressing need for additional, useful open space."

It was basically for those reasons that Diamond strongly recommended "that 'Tilted Arc' be relocated and that the plaza be returned to the public." Diamond also reported in his opinion on the alleged contract rights claimed by Serra, the claim to site specificity of the sculpture, the New York statutory claim, and the alleged compromise of the integrity of the Art-In-Architecture Program. Diamond concluded by saying, "In this matter, GSA is required to act in the position of arbitrator or public guardian, carefully weighing the needs of the populace with those of the art community." Diamond consequently recommended that Ink "order the relocation."

Diamond specifically reported that:

"My consideration of the issue of whether to relocate the sculpture would not be in any way based upon the arguments of its beauty, its ugliness, or its place in art history."

\* \* \* \* \* \*

"There can be no controversy that the space has been bisected, physical passage obstructed, and the atmosphere of the Plaza turned into affrontery."

\* \* \* \* \* \*

"Analogous to my declination [sic] to evaluate the artistic merit therefor, is any attempt in any way to censor, stifle, or suppress the freedom of expression of the artist."

On May 9, 1985, following the local administrator's recommendation but prior to any decision by GSA, Serra himself met with Ink and members of his staff in Ink's office in Washington. Serra articulated his concept of site specificity at length, and stated that Tilted Arc would be negated and destroyed if relocated.

### E. The GSA Decision

On or about May 31, 1985, after considering Diamond's report of May 1, 1985, the administrative record, and the proliferating expression of views including those of Serra and his attorney, Administrator Ink rendered his decision that Tilted Arc should be relocated, but not destroyed. He concluded "Tilted Arc would not be destroyed if it were moved to another compatible place with adequate viewing space." He relied heavily on the testimony given at the hearing. He made no findings as to plaintiff's conclusory charges that Diamond had prejudged the issue at the hearing, and that Diamond had ensured, through manipulating the Panel, its recommendation to relocate Tilted Arc. No acceptable evidence thereof has been adduced.

Ink pointed out that his decision to relocate was being made on the administrative record and only after considering that thousands of people had expressed their views through days of public hearings, that innumerable letters and signed petitions had been received, and after the issue had been widely debated in the press.

The reasons for the decision to search for an acceptable alternative site for Tilted Arc clearly exclude any judgment on the aesthetics or the content of the art. Ink's decision firmly states, "... I made no judgment whatsoever concerning the aesthetic value of the Tilted Arc." Ink's decision included the following points:

1. *Physical Destruction is Rejected*
 "I reject the option of physically destroying the Tilted Arc as violating our sense of values which tell us that deliberate destruction of art, which has limited acceptance, is not compatible with a free society which prides itself on encouraging free expression of art."

2. *The Nature of Relocation Site To Be Sought*
 The National Administrator is directed to, "seek a new location for the Arc where it would not suffer significant loss of integrity as an artwork."

3. *Selection Criteria for Relocation Site*
 "Possible relocation ... is an action which requires a process involving careful consideration of various points of view, including that of the artist.... [D]etermining whether a particular alternate location would be an appropriate site should be made only upon receipt of recommendations from a panel of individuals appointed by the Chairman of the National Endowment for the Arts (NEA). This panel should include members of the art and design community and representation from both the communities under consideration and from the residents and employees in the area near Foley Square."

4. *Status of the Art During Relocation Search*
 "The Tilted Arc should be retained in its present location" during the period while another location is being considered and is not to be disturbed meanwhile.

No part of the decision and none of the reasons for a relocation site were related to aesthetics or content of Tilted Arc. There is no evidence to the contrary. Nothing in the recommendations for relocation furnished by the local GSA Administrator dwelt on, or was based upon, any question of aesthetics or content of the art. The relocation recommendation was made "in order to regain the openness of the Plaza; because major events heretofore held in the Plaza for the benefit of the Federal community have been diverted to other locations or have been drastically reduced in scope so as to be able to fit within the

confines of the 26 Federal Plaza building.... [T]he fact that it [Tilted Arc] bisects the Plaza makes it physically impractical to use the Plaza for the same public beneficial purposes as was done prior to its installation." There is nothing in the Decision which contradicts that recommendation or finds to the contrary.

### F. The First Amendment Has Not Been Violated

 Serra's First Amendment claim is that Tilted Arc is constitutionally protected expression and that GSA's decision to relocate the sculpture violates his freedom of speech.

A threshold issue is whether Tilted Arc is "speech" entitled to First Amendment protection. The burden is on the plaintiff to demonstrate that the First Amendment applies. *Clark v. Community For Creative Non-Violence*, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069, n. 5, 82 L.Ed.2d 221 (1984).

The Supreme Court has held that ideas need not necessarily be spoken or written to qualify for First Amendment protection. *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (black armband worn by public school students to protest U.S. policy in Vietnam); *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (sit-in by black students in "whites only" library to protest segregation); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (flying red flag designating support for communism). Courts have assumed that artistic work is protected by the First Amendment. *See e.g. Piarowski v. Illinois Community College*, 759 F.2d 625, 628 (7th Cir.), *cert. denied*, 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985) (relocation of art by a state college upheld against First Amendment challenge).

Without deciding the issue, the Court assumes for the purposes of this motion that Tilted Arc is expression protected to some extent by the First Amendment. *See Clark v. Community For Creative Non-Violence*, 468 U.S. at 293, 104 S.Ct. at 3069 (assuming but not deciding that overnight sleeping in connection with demonstration entitled to some First Amendment protection).

Even if Tilted Arc is speech, Serra's First Amendment rights in Tilted Arc must be balanced against the authority and mission of the GSA stemming from the Constitution itself, and against the fact that Serra conveyed title in the work to the GSA. The GSA owns the sculpture, and with that ownership comes a significant degree of control over the structure when exercised in the public interest. The sculpture falls within the statutory definition of "public building;" it is part of the "grounds, approaches, and appurtenances" of the Federal Plaza office building. *See* 40 U.S.C. § 612(1).

The Constitution does not grant Serra the authority to completely prevent the GSA from carrying out its statutory authority to maintain, alter and manage government buildings, their grounds and appurtenances. The GSA must have reasonable latitude to carry out its mandate. The latitude here is narrowly confined and surrounded with safeguards to conserve the art and its constitutional privileges.

Government may sometimes curtail speech when necessary to advance a significant and legitimate government interest. *Clark v. Community For Creative Non-Violence*, 468 U.S. at 293, 104 S.Ct. at 3069; *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984).[5]

Of course the First Amendment forbids government from regulating speech based on the content of its message, or regulating speech in ways that favor some viewpoints or ideas at the expense of others. *Carey v. Brown*, 447 U.S. 455, 462–63, 100 S.Ct. 2286, 2291, 65 L.Ed.2d 263 (1980);

---

**5.** Both plaintiff's and defendants' protracted arguments as to whether the plaza is a public forum miss the point that government may reasonably regulate speech in such a forum as long as it does so without regard to the content of that speech. *Clark v. Community For Creative Non-Violence*, 468 U.S. at 293, 104 S.Ct. at 3069; *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

*Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). However this proscription is not applicable in this case.

There is no evidence in the record that GSA's decision to relocate the sculpture was based on the content of its message. Plaintiff contends that Tilted Arc, as artistic expression, communicates philosophical, social and political meanings. However, there is no suggestion that GSA's decision was motivated by any of these asserted meanings.

The claim that the relocation decision was designed to suppress Serra's ideas that some may find distasteful, or that it has been applied to Serra because of the views that the sculpture expresses, is a self-interested constructed conclusion, finds no factual support in the conclusory allegations and statements supplied by plaintiff. This conclusion is belied by findings of fact established by the conduct of the Government representatives and the care with which every legitimate concern of Serra's has been met. The extensive processes to determine possible relocation, the retention of the work in the Plaza during the relocation search, the precise specifications laid down for an acceptable relocation site, the inclusion of the artist in the search committee, were all designed to conserve and foster the free expression of the sculptor and the sculpture. This is not a case where a decision to remove or relocate art was based on its political or other content. Simply put, the purpose to relocate is not because of disagreements with the message presented.

GSA's decision to relocate the structure was undertaken for functional purposes—in order to regain the openness of the plaza.[6] Selecting landscape and architecture for government buildings is a legitimate and important objective at the heart of GSA's statutory responsibility to manage federal buildings for the benefit of the public. The decision to relocate narrowly focuses on the government's substantial interest in maintaining Federal Plaza in an attractive, open and intact condition, readily available to the multitude of people who wish to enjoy the open and openly available space.[7]

The GSA was within its authority when it found that the sheer size of the sculpture, wholly apart from its message, rendered the plaza physically impractical for use as a site for major events and public gatherings. GSA responded to a significant governmental interest when it found that the plaza was bisected, physical passage obstructed, and the public dissuaded from and denied most of the uses that a public plaza could provide.

Thus, GSA's decision to relocate Tilted Arc is a valid content-neutral determination. It furthers an important governmental interest unrelated to the suppression of speech and the incidental restriction on alleged First Amendment freedoms and is no greater than is essential to the furtherance of that interest. *Clark v. Community for Creative Non-Violence,* 468 U.S. at 293, 104 S.Ct. at 3069; *Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. at 2129; *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

The only way in which the GSA can restore openness to the plaza, a valid objective, is to relocate the vast physical structure which is Tilted Arc. The GSA decision "responds precisely to the substantive problem which legitimately concerns" the government, and "curtails no more speech

---

6. Plaintiff contends that GSA's decision to relocate the structure was based in part on an *aesthetic evaluation, or because some believed* the rusting structure to be an eyesore. Advancing aesthetic values and eliminating visual clutter are weighty and constitutionally legitimate objectives of government. *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. at 806–807, 104 S.Ct. at 2129–2130; *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 507–508, 101 S.Ct. 2882, 2892–2893, 69 L.Ed.2d 800 (1981) (opinion of Justice White, joined by Justices Stewart, Marshall, and Powell); *Berman v. Parker,* 348 U.S. 26, 32–33, 75 S.Ct. 98, 102–103, 99 L.Ed. 27 (1954).

7. The sculpture as presently located has features of a purpresture. *See* 4 W. Blackstone, Commentaries *168 n. 8. ["An inclosure by a private person of a part of that which belongs to, and ought to be free and open to the enjoyment of, the public at large, is a purpresture."]

than is necessary to accomplish its purpose." *Taxpayers v. Vincent*, 466 U.S. at 811, 104 S.Ct. at 2132. The interest cannot be served more narrowly. The relocation decision leaves open ample alternative channels for communication of Serra's message. GSA has not attempted to ban Serra's sculpture generally. Rather, GSA has embarked on an aggressive search for an ample, acceptable, alternative site for the work, and has included plaintiff's participation in that search.

Finally, Serra's claim that the sculpture is site-specific is not sufficient to paralyze or prohibit GSA's ability to reasonably manage and alter government buildings. The GSA took Serra's claim into consideration as part of its deliberations and decision to relocate the statute. Serra is entitled to no more.

In sum, Serra's First Amendment rights must be evaluated in the context of his voluntary decision to convey ownership of the object to the government; GSA's reasonable authority to manage the massive physical structure which it owns and which became part of a government building; GSA's careful decision to relocate the work for neutral reasons unrelated to the sculpture's content or message; and GSA's attempt to narrowly serve its interests while not ignoring plaintiff's interests by relocating Tilted Arc in a more suitable forum rather than simply removing and destroying the work. Based on all of these factors, the decision to relocate the sculpture did not violate the First Amendment.

### G. The Fifth Amendment Has Not Been Violated

▮ The GSA's procedures were in complete conformity with due process of law. The artist and his lawyer were notified, given an opportunity to be heard, and continued to argue their position before the Administrator in Washington, D.C. They had a full opportunity to make their viewpoint known before any decision was made. Serra was not deprived of due process of law by defendants' actions.

### H. Findings and Conclusions

The foregoing shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a). Like the district court in *Taxpayers for Vincent*, the findings by this Court "do not purport to resolve any disputed issue of fact; instead, they summarize material in the record that appears to be uncontroverted." 466 U.S. at 793, 104 S.Ct. at 2122.

Accordingly, the claimed constitutional violation is dismissed on the merits. The remainder of the complaint is dismissed for lack of district court jurisdiction on the ground of sovereign immunity. This disposition necessarily moots the cross-motion for partial summary judgment sought by plaintiff.

SO ORDERED.