MANVILLE SALES CORPORATION,
Plaintiff/Cross–Appellant,

v.

PARAMOUNT SYSTEMS, INC., Robert
S. Butterworth and Anthony J.
Disimone, Defendants–Appellants.

Nos. 90–1148, 90–1175.

United States Court of Appeals,
Federal Circuit.

Oct. 23, 1990.

Ernie L. Brooks, Brooks & Kushman, Southfield, Mich., argued for plaintiff/cross-appellant. With him on the brief was Thomas A. Lewry.

Manny D. Pokotilow, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Philadelphia, Pa., argued for defendants-appellants. With him on the brief were Alan H. Bernstein and Max Goldman.

Before ARCHER, MICHEL, and CLEVENGER, Circuit Judges.

MICHEL, Circuit Judge.

Paramount Systems, Inc. (Paramount), Robert S. Butterworth, and Anthony J. DiSimone appeal the United States District Court for the Eastern District of Pennsylvania's September 7, 1989, judgment awarding Manville Sales Corporation (Manville) damages for infringement of U.S. Patent No. 3,847,333 (the '333 patent).

*Manville Sales Corp. v. Paramount Sys., Inc.*, 14 USPQ2d 1291, 1989 WL 104953 (E.D.Pa.1989). Appellants contend that the district court erred in holding that the '333 patent was not invalid because the court erroneously concluded that the invention was not on sale nor in public use prior to the section 102(b) bar date, February 5, 1972. Appellants also appeal the district court's order denying their Motion to Alter or Amend the Judgment, asserting that because of 28 U.S.C. § 1498(a) (1988) the district court lacked subject matter jurisdiction to award damages for infringing sales that, it alleges, were made for or sold to the U.S. government. *Manville Sales Corp. v. Paramount Sys., Inc.*, 14 USPQ2d 1299, 1301, 1989 WL 151198 (E.D.Pa.1989). Manville cross-appeals, challenging the amount of damages awarded. We affirm all appealed issues except we reverse as to personal liability of individual defendants.

## BACKGROUND

In early 1971, a Manville division was awarded a subcontract to supply the luminaire assembly for a 150-foot tall, three-foot diameter lighting pole to be installed in the Fort Steele Rest Area along a highway near Rawlins, Wyoming. The assembly was installed, but failed in September, 1971.

Later that same month, Manville's research manager, Robert Zeller, conceived of a new *self-centering* luminaire assembly design capable of travelling readily up and down a pole, thereby providing reliable accessibility for maintenance to the luminaires. The invention had "iris" guide arms, whereas the prior art device installed in Wyoming had vertical guide arms. (See Figure 1.) The guide arms are intended to apply forces between the light pole and the luminaire support such that the assembly maintains a centered position while travelling up and down the pole. Otherwise, the luminaire assembly can get stuck high up the pole. By late October, Zeller had constructed a working model of the new design and had installed it on a test pole at Manville's R & D center in Ohio. [App. at 519–21.]

On October 29, 1971, after the new design proved operable on the test pole, Zeller sought permission from a Wyoming state official to try his new iris arm design as a substitute for the vertical guide arm device previously installed that had failed. With his request, Zeller sent a drawing that included a confidentiality notice. Wyoming law preserved the confidentiality of such drawings.

**Prior Art:** **Patented Invention:**
**Vertical Guide Arm** **Iris Arm Luminaire**
**Luminaire Assembly** **Assembly**

**Figure 1**

In response to Zeller's request, a Wyoming official conditionally approved payment for the new design subject to its performing satisfactorily, after installation.

The district court found that "contemporaneous 1971 documents and the testimony demonstrate that no one could have known at that time whether the new iris arm would work as intended at Fort Steele." *Manville*, 14 USPQ2d at 1293. Manville asserts that the new design's durability in weather conditions was unknown, and that Manville sought to install the new iris arm to test it under wind, cold and corrosive atmospheric conditions.

Zeller installed the iris arm device at the rest area in November 1971 when it was not yet open to the public. In March 1972, Zeller was notified by a Manville sales representative that supports that attach the luminaires to the ring (see Figure 1) had fallen off due to severe weather conditions. Zeller returned to Wyoming that month to fix the supports. After Zeller lowered the

assembly, he concluded that the iris arms worked properly even after the Wyoming winter and despite the luminaire-to-ring support failure. On his way back to Ohio, Zeller stopped in Cheyenne and sought state approval for purchase of the iris arm device as fulfilling the original contract. In April 1972, Wyoming officials inspected the device and authorized payment. The rest area was opened to the public in June 1972.

Meanwhile, on February 7, 1972, Zeller had begun pursuing an iris arm design for two-foot diameter poles. Manville subsequently delayed shipments of lowering devices so that the new iris arms could be included. On March 10, 1972, Manville approved the iris arms for commercial use. Manville began notifying its sales staff of the decision to use the iris arms on March 15, 1972, and the iris arms first appeared in Manville's owners' manuals one week later. On April 20, 1972, Manville installed an iris

arm in Nebraska. A patent application was filed on February 5, 1973, that later issued as the '333 patent.

In 1984, Anthony DiSimone, Paramount's corporate secretary, obtained a copy of a drawing of Manville's iris arm device that had been submitted to the Florida Department of Transportation. DiSimone sent the drawing to Robert Butterworth, Paramount's president. Butterworth gave the drawing to Ralph Bloom, a Paramount designer, for use in designing a self-centering raise/lower device that was later made and sold by Paramount.

Manville filed suit against Paramount on July 14, 1986, alleging infringement of the '333 patent. DiSimone and Butterworth were added as party-defendants on March 11, 1987. After a bench trial, the district court found direct infringement by Paramount, pursuant to 35 U.S.C. § 271(a) (1988), and direct and induced infringement by DiSimone and Butterworth, pursuant to 35 U.S.C. § 271(a) & (b). The court also concluded that the '333 patent was not invalid under 35 U.S.C. § 102(b) due to an on sale or public use bar because Manville's Wyoming activities constituted experimental use. The court further concluded that the patent was not unenforceable due to inequitable conduct because intent to mislead or deceive the U.S. Patent and Trademark Office (PTO) was not proven. Accordingly, the court entered judgment against Appellants and awarded damages to Manville.

Appellants filed a Motion to Alter or Amend the Judgment, pursuant to Rules 52 and 59(e) of the Federal Rules of Civil Procedure. Appellants claimed that, because of 28 U.S.C. § 1498(a) (1982), the district court lacked jurisdiction to award damages with respect to most of the infringing sales because those devices, it alleged, were made for or sold to the United States. The district court denied the motion.

Manville also filed a Motion to Amend the Judgment, pointing out that the district

court had not made any findings on Manville's claim of *reduced* profits, as opposed to lost profits. The district court denied the motion in an October 17, 1989, order, stating that the "court was not convinced that the requested finding of fact was proved by the preponderance of the evidence." [App. at 2230.]

Appellants timely appealed and Manville timely filed a cross-appeal. The district court had jurisdiction under 28 U.S.C. § 1338 (1982) and this court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1988).

## ANALYSIS

I. *On Sale and Public Use Statutory Bars*

■ As the parties asserting that on sale and public use bars[1] apply to Manville's invention, Appellants must prove the existence of a bar by clear and convincing evidence. *See Envirotech Corp. v. Westech Eng'g Inc.*, 904 F.2d 1571, 1574, 15 USPQ2d 1230, 1232 (Fed.Cir.1990); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266, 229 USPQ 805, 808 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). Whether or not an invention was on sale or in public use within the meaning of section 102(b) is a question of law that this court reviews de novo; however, factual findings underlying the trial court's conclusion are subject to the clearly erroneous standard of review. *See Envirotech*, 904 F.2d at 1574, 15 USPQ2d at 1232; *Moleculon*, 793 F.2d at 1266, 229 USPQ at 808.

■ In order to determine whether an invention was on sale or in public use, we must consider how the totality of the circumstances comports with the policies underlying the on sale and public use bars. This approach is necessary because "the policies or purposes underlying the on sale bar, in effect, define it." *Envirotech*, 904 F.2d at 1574, 15 USPQ2d at 1232 (quoting *RCA Corp v. Data General Corp.*, 887 F.2d 1056, 1062, 12 USPQ2d 1449, 1454

---

1. Section 102 of title 35 of the United States Code states in pertinent part: "A person shall be entitled to a patent unless ... the invention was

... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

(Fed.Cir.1989)). In *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 226 USPQ 402 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986), we enumerated several of these underlying policies, including "discouraging the removal of inventions from the public domain which the public justifiably comes to believe are freely available," "prohibiting an extension of the period for exploiting the invention," and "favoring prompt and widespread disclosure of inventions." *Id.* at 860, 226 USPQ at 406.[2] On the facts of the instant case, these underlying policies do not support the invalidation of the '333 patent because of an on sale or public use bar, nor can we conclude that the district court's underlying fact findings were clearly erroneous.

First, Manville did nothing to lead the public to believe that its iris arm invention was in "the public domain." On the contrary, Manville conveyed to a Wyoming official that its use of the invention on one pole at one site in Wyoming was experimental. Although Manville did not advise anyone else that its use was experimental and was not intended to release its invention into the public domain, the particular circumstances made such efforts unnecessary. Manville marked its design drawing with a confidentiality notice before disclosing it to a Wyoming official, and Wyoming law prohibited officials from disclosing confidential information to the public. *Compare Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1535, 222 USPQ 553, 558 (Fed. Cir.1984) (affirming a section 102(b) bar and noting that users lacked any secrecy obligations). Additionally, the invention was mounted atop a 150-foot tall pole in a rest area still closed to the public, making it very unlikely that the public would even see the new design. We therefore conclude that there was no conduct by Manville that would lead the "public" to reasonably believe the invention was in the public domain. Nor is there any indication that the public had such a perception.

■ Second, Manville did not attempt to extend the patent term by commercially exploiting its invention more than one year before it filed a patent application. Manville retained ownership of the lowering device and did not notify its sales personnel about the invention, or initiate a sales campaign to market the iris arm design until March of 1972, after it first determined, based on inspecting the Fort Steele device, that the iris arms worked for their intended purpose. *Compare U.S. Environmental Products Inc. v. Westall*, 911 F.2d 713 (Fed.Cir.1990) (affirming a section 102(b) bar and noting the patent holder did not retain control over the invention and initiated promotional efforts during the asserted experimental use period). Moreover, although Manville eventually received compensation for the iris arm device in fulfillment of its original contract with Wyoming, a sale that is primarily for experimental purposes, as opposed to commercial exploitation, does not raise an on sale bar. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1563, 4 USPQ2d 1210, 1213 (Fed.Cir.1987). Because Manville did not attempt to use the invention when it first bid on the Wyoming contract, and did not offer to sell the iris arm to anyone else until after it was tested in the cold, rain, snow, and wind—an environment in which it was designed to operate—we must agree with the district court that experimentation, and not profit, was the primary motive behind Manville's Wyoming use.

Finally, Manville's actions are entirely consistent with the policy "favoring prompt and widespread disclosure of inventions." The iris arm device was specifically designed to withstand year around weather. Prior to its testing in the winter environment, there really was no basis for confidence by the inventor that the invention would perform as intended, and hence no proven invention to disclose. *See Gould*

---

**2.** An additional policy enumerated in *King*, "giving the inventor a reasonable amount of time following the sales activity to determine the value of a patent," *id.*, 767 F.2d at 860, 226 USPQ at 406, is not implicated here because Manville concedes that the period of experimental testing ended when sales activity began in March 1972 when it published new owners' manuals and authorized promotion by its sales force concerning the new iris arm device.

*Inc. v. United States,* 579 F.2d 571, 583, 217 Ct.Cl. 167, 190, 198 USPQ 156, 167 (1978) (period of experimental use continues until after the inventor "conducts tests needed to convince himself that the invention is capable of performing its intended purpose in its intended environment"). The evidence indicates, moreover, that once the outdoor tests were complete, and the invention was found to work as intended, Manville acted within the statutorily prescribed period in disclosing the invention, once tested, to the public.

Contrary to Appellants' argument, merely because Manville also tested the invention briefly in Ohio does not mean Manville had ascertained whether the invention was operable for its intended purpose in its intended environment. When durability in an outdoor environment is inherent to the purpose of an invention, then further testing to determine the invention's ability to serve that purpose will not subject the invention to a section 102(b) bar. *See City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 133–34, 24 L.Ed. 1000 (1878) (concluding that a road surface test for "durability" by observation over six years of exposure to heavily loaded wagons constituted an experimental use).

Nor is this a case of a patentee attempting, after the fact, to portray his earlier actions as experimental use. As the district court correctly found, a Manville internal company memorandum, dated February 29, 1972, makes clear that at the time of the Wyoming activities, Manville considered them to be experimental. The memo, captioned "State of Wyo—Our experimental HMO installation," discussed problems with the installation, referring to "the 100MPH steady winds that area can experience," and noting that "[f]orces occur on top of that pole that cannot be factory tested." Thus, it is clear that Manville was aware at the time of the Wyoming installation that testing in the outdoor environment was necessary to determine whether the invention worked as intended, and it clearly regarded the installation itself as an experiment.

Accordingly, we conclude that Appellants have failed to establish a "public use or on sale" bar to the granting of a valid patent under section 102(b).

## II. *Inequitable Conduct*

■ Paramount also claims that the '333 patent should have been held unenforceable due to Manville's inequitable conduct. Inequitable conduct requires proof by clear and convincing evidence. A threshold showing of both materiality and intent to mislead or deceive must be first established, and then those fact-findings are balanced to make the determination whether "the scales tilt to a conclusion that inequitable conduct occurred." *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1560, 223 USPQ 1089, 1092 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The ultimate determination is committed to the discretion of the trial court because it is based on equitable considerations, but may be overturned not only for abuse of discretion if the court made a serious error of judgment, but also if it has been established that it was based upon clearly erroneous findings of fact or a misapplication or misinterpretation of applicable law. *See Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 872, 9 USPQ2d 1384, 1392 (Fed.Cir. 1988) (in banc).

■ Appellants specifically contend that the district court's determination that "[t]here was no duty to disclose experimental uses to the PTO in 1973 and 1974" (the period during which the '333 patent was prosecuted) was error. *See Manville,* 14 USPQ2d at 1299. We agree, but conclude it was harmless.

Although extensive regulations were not promulgated concerning the duty of disclosure until 1977, *see* 37 C.F.R. § 1.56 (1977), and specific procedures concerning experimental use disclosures were not conveyed to examiners until 1980, *see* U.S. Department of Commerce, Patent and Trademark Office, *Manual of Patent Examining Procedure* § 2001.04, at 500.16 (4th ed., rev. 2, Apr.1980), the prevailing law concerning inequitable conduct was in existence in

1973–74 and was not altered by the new regulations. *See* 42 Fed.Reg. 5588, 5589 (1977) (stating that the amendments to section 1.56 were believed to be consistent with the prevailing case law). Admittedly, however, at the time the '333 patent was prosecuted the law of inequitable conduct may not have been as clear as it is today. *See generally* I. Kayton, J. Lynch & R. Stern, *Fraud in Patent Procurement: Genuine and Sham Charges*, 43 Geo. Wash. L. Rev. 1, 25–50 (1974) (discussing the varied approaches taken by the courts when faced with fraud and inequitable conduct cases). Nonetheless, the basic tenets of inequitable conduct as summarized in *J.P. Stevens* were the law by 1973–74. *See, e.g., Norton v. Curtiss*, 433 F.2d 779, 792–97, 57 CCPA 1384, 1401–07, 167 USPQ 532, 543–47 (1970). Essentially, Manville had a duty to disclose *all* information, including uses and sales of its invention more than one year before it filed its application, if such information would be deemed "material." *See id.* The district court erred in concluding that there was no duty to disclose the experimental use. However, the district court found that Appellants failed to provide any evidence of intent to mislead or deceive, and we cannot say this finding was clearly erroneous. We therefore conclude the district court's error was harmless.

Appellants also argue that the district judge's finding that deceptive intent was not proven was clearly erroneous because the experimental use was highly material, and Zeller, the inventor, was aware of the use but did not disclose it to the examiner. "However, materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567, 5 USPQ2d 1769, 1778 (Fed.Cir.), *cert. denied*, 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). Appellants must show by clear and convincing evidence that Manville acted inequitably by *intending to mislead or deceive* the PTO. The district court found that no such showing has been made. As we noted in *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 882 F.2d 1556, 1562, 11 USPQ2d 1750, 1755 (Fed.Cir.1989), "[G]rossly negligent conduct may nor may not compel an inference of an intent to mislead." Here it did not. Thus, we conclude that the trial court's finding was not clearly erroneous and its conclusion that no inequitable conduct occurred was not an abuse of discretion.

### III. *Personal Liability of Paramount's Officers*

#### A. Direct Infringement—35 U.S.C. § 271(a)

Section 271(a) provides that "whoever without authority makes, uses or sells any patented invention ... infringes the patent." For Butterworth and DiSimone, officers of Paramount, to be personally liable for Paramount's infringement under section 271(a), there must be evidence to justify piercing the corporate veil. *See A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 596, 7 USPQ2d 1066, 1068 (Fed.Cir.1988). Often a party asking a court to disregard the corporate existence will attempt to show that the corporation was merely the alter ego of its officers. *See Zubik v. Zubik*, 384 F.2d 267, 271–72 (3d Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). More generally, a court may exert its equitable powers and disregard the corporate entity if it decides that piercing the veil will prevent fraud, illegality, injustice, a contravention of public policy, or prevent the corporation from shielding someone from criminal liability. *Id.* at 272. The court, however, must "start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *Id.* at 273. Moreover, unless there is at least "specific intent to escape liability for a specific tort ... the cause of justice does not require disregarding the corporate entity." *Id.*

In the instant case, the district court determined that Butterworth and DiSimone were personally liable for direct infringement. The district court based this decision on its finding that Butterworth and DiSimone took actions that assisted the

copying of Manville's design. [App. at 21–22.] DiSimone obtained a drawing of Manville's iris arm design from the Florida Department of Transportation. He sent it to Butterworth who passed it on to Paramount's designer for use in designing Paramount's self-centering device. Although these facts support the conclusion that the officers had knowledge of their acts, these acts were within the scope of their employment and thus were protected by the corporate veil. *See* W. Fletcher, 10 *Fletcher Cyclopedia of the Law of Private Corporations* § 4877, at 323–24 (rev. perm. ed. 1986) [hereinafter *W. Fletcher*].

Nonetheless, the court held them personally liable. The court did so despite having concluded that Paramount was *not* the alter ego of the officers. *Manville*, 14 USPQ2d at 1298. Moreover, the court had found that the "evidence at trial did not demonstrate that Paramount knew of Manville's patent prior to this lawsuit" and that Paramount's subsequent infringing activity continued because of Paramount's good faith belief, based on the advice of counsel, that it was not infringing. *See id.* Although the district court made these findings explicitly with respect to Paramount, we conclude that these findings must also apply to Butterworth and DiSimone; any contrary knowledge or belief by the officers would have been imputed to the corporation under agency principles. *See* 3 *W. Fletcher*, § 832, at 171.

Based on the district court's own underlying findings, and the record presented to us, we conclude that the court's determination that Butterworth and DiSimone were personally liable, because it was based on piercing the corporate veil, was an abuse of its equitable powers. The district court's findings establish that the officers were acting within the scope of their employment. The court's findings preclude any inference that Butterworth and DiSimone were attempting to avoid liability under the protection of the corporate veil. Accordingly, we reverse as to the liability of the officers in their individual capacities with respect to infringement under section 271(a).

**B. Active Inducement to Infringe—35 U.S.C. § 271(b)**

Section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Under this section, corporate officers who actively assist with their corporation's infringement may be personally liable for inducing infringement *regardless* of whether the circumstances are such that a court should disregard the corporate entity and pierce the corporate veil. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1578–79, 1 USPQ2d 1081, 1090 (Fed.Cir.1986). The alleged infringer must be shown, however, to have *knowingly* induced infringement. *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668, 7 USPQ2d 1097, 1103 (Fed.Cir.1988). It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements. *See id.; see also Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468–69, 15 USPQ2d 1525, 1528–29 (Fed.Cir.1990); *cf. Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488, 84 S.Ct. 1526, 1533, 12 L.Ed.2d 457, 141 USPQ 681, 688 (1964) (stating that section 271*(c)* requires a showing that an alleged *contributory* infringer knew that acts would be infringing).

In the instant case, the district court determined, pursuant to section 271(b), that Butterworth and DiSimone were liable for inducing infringement. The court did so, however, after finding that like Paramount, Butterworth and DiSimone were not aware of Manville's patent until suit was filed and that Paramount's subsequent infringing acts continued upon Butterworth's and DiSimone's "good faith belief," based on advice of counsel, that Paramount's product did not infringe. *Manville*, 14 USPQ2d at 1298.

Based on the district court's own findings and the record presented to us, we conclude that the district court's decision to hold Butterworth and DiSimone liable under section 271(b) was contrary to law. There is simply neither compelling evidence nor any findings that the officers had specific intent to cause another to infringe. We therefore reverse as to the liability of the officers in their individual capacities with respect to infringement under section 271(b). .

IV. *Appellants' Motion to Alter or Amend*

■ Appellants assert that because ninety percent of the sales for which the district court assessed damages were products made for or sold to the United States,[3] under 28 U.S.C. § 1498(a) (1988), the district court lacked jurisdiction to award infringement damages for those sales. They argue that jurisdiction would lie only in the United States Claims Court. Accordingly, Appellants argue that the district court erred as a matter of law in concluding that section 1498(a) is not jurisdictional, but merely provides an affirmative defense that Appellants failed to timely raise.

We review questions concerning subject matter jurisdiction *de novo.* *Kunkel v. Topmaster Int'l Inc.,* 906 F.2d 693, 695, 15 USPQ2d 1367, 1368 (Fed.Cir.1990).

Section 1498(a) of title 28 of the United States Code states:

Whenever an invention described in and covered by a patent of the United States is used or manufactured *by or for* the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Claims Court for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a) (1988) (emphasis added). The Supreme Court has established that section 1498(a) is to be applied, at least with respect to suits to which the United States is not a party, as a codification of a defense and not as a jurisdictional statute. *See Sperry Gyroscope Co. v. Arma Eng'g Co.,* 271 U.S. 232, 235–36, 46 S.Ct. 505, 506, 70 L.Ed. 922 (1926).

In *Sperry,* an infringement suit between private parties, a district court dismissed a complaint for lack of jurisdiction under the predecessor of the current section 1498(a).[4] On appeal, the Supreme Court stated that the issue concerning this provision was not one of jurisdiction, but rather went to the merits of the case:

The argument is that the Act of 1918 [section 1498(a)] deprived the District Court of jurisdiction over the controversy between the present parties because it limited the patent owner's remedy, under circumstances like those here disclosed, to a suit against the United States in the Court of Claims. But we think this contention goes to the merits of the matter, and not merely to the question of jurisdiction. The true intent and meaning of the statute is not free from doubt; but certainly there is nothing therein which shows any clear purpose to take away the power to decide. It became the duty of the court below to consider and determine whether, in the circumstances stated, appellee was relieved of liability and permitted by the statute to do what otherwise would have constituted a violation of appellant's rights. There was jurisdiction.

271 U.S. at 235–36, 46 S.Ct. at 506. Accordingly, the Court reversed the dismissal

3. Appellants argue that most of the infringing sales were under subcontracts for the U.S. government or were sales to state governments for highway contracts substantially "controlled" and funded by the U.S. government through the interstate and federal highway construction funding programs. Because of our decision, *infra,* we need not decide whether these sales should be construed as sales "for" the United States under section 1498(a).

4. In *Sperry,* the Court interpreted the Act of 1918, c.114, 40 Stat. 704, 705, the pertinent portion of which has remained essentially unchanged through its present codification at 28 U.S.C. § 1498(a).

for lack of jurisdiction and remanded for further proceedings.[5]

Appellants argue that to interpret *Sperry* to mean that section 1498(a) is only a codification of an affirmative defense would be contrary to this court's later decisions in *Trojan, Inc. v. Shat–R–Shield, Inc.*, 885 F.2d 854, 12 USPQ2d 1132 (Fed. Cir.1989), and *W.L. Gore & Associates v. Garlock, Inc.*, 842 F.2d 1275, 6 USPQ2d 1277 (Fed.Cir.1988). In *Trojan* and *Garlock*, however, this court faced significantly different issues than those presented in the instant case. Neither of those decisions even addressed whether section 1498(a) was a jurisdictional statute. Accordingly, those cases cannot control here.[6] Because Appellants have failed to provide

any persuasive authority contrary to *Sperry*, we conclude that the district court properly considered section 1498(a) as providing an affirmative defense[7] that Paramount failed to timely raise.[8] We therefore affirm the district court's denial of the Motion to Alter or Amend the Judgment.

## V. *Damages*

■ We review trial court's determinations of damages under an abuse of discretion standard. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898, 229 USPQ 525, 526 (Fed.Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). " 'Abuse of discretion may be established by showing that the district court either

---

5. Although one district court has interpreted the Supreme Court's terse decision as merely ruling that the district court had jurisdiction to decide jurisdiction, *see Fulmer v. United States*, 83 F.Supp. 137, 143, 80 USPQ 545, 551 (S.D.Ala. 1949), we conclude that the Court's holding is not thus limited. The decisions which the Supreme Court cited for support in *Sperry* reveal that such "threshold jurisdiction" was *not* at issue in those cases. *See Sperry*, 271 U.S. at 236, 46 S.Ct. at 506 (citing *Smyth v. Asphalt Belt Ry.*, 267 U.S. 326, 45 S.Ct. 242, 69 L.Ed. 629 (1925)); *Smith v. Apple*, 264 U.S. 274, 44 S.Ct. 311, 68 L.Ed. 678 (1924); *The Pesaro*, 255 U.S. 216, 41 S.Ct. 308, 65 L.Ed. 592 (1921).

6. Some statements were made in these cases about the effects of section 1498(a) with respect to fora. *See, e.g., Trojan*, 885 F.2d at 856, 12 USPQ2d at 1134 (stating that "a patent owner's 'only recourse' when an infringer is dealing with the government is to 'sue the United States in the United States Claims Court' " (quoting *Garlock*, 842 F.2d at 1283, 6 USPQ2d at 1284)). Although Appellants argue that these statements imply that under section 1498(a) the Claims Court is the only court with jurisdiction to hear infringement claims when the infringing goods were for the government, in neither decision did this court so hold.

Moreover, there is no conflict between these decisions and *Sperry*. Neither *Sperry, Trojan*, nor *Garlock* dealt with whether section 1498(a) is a jurisdictional statute with respect to suits *against the United States*. Without deciding, we see no inconsistency between interpreting section 1498(a) as a jurisdictional statute (waiving sovereign immunity) in suits against the United States and as merely codifying a defense that private parties who are alleged infringers may raise on the merits. That two different effects occur depending on the party raising section 1498(a) is the clear implication of *Sperry* and the other cases, read together.

7. Our decision in *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1 USPQ2d 1071 (Fed.Cir.1986), is not to the contrary. There, the district court had granted defendant's motion for summary judgment where the infringing use clearly had been solely for the government. We noted that "[t]he effect of the [district] court's action was to dismiss the complaint for lack of jurisdiction." *Id.* at 1058 n. 1, 1 USPQ2d at 1071 n. 1. Despite this statement, we affirmed. This statement is merely dictum, and in any event does not mean that the district court *actually* lacked jurisdiction, but only that the *outcome* of the case is the same as if it had lacked jurisdiction. (If the district court had lacked jurisdiction, we would not have affirmed its grant of summary judgment, but would have vacated the judgment of the district court and remanded with instructions to dismiss for lack of jurisdiction.) Moreover, read in context, *TVI Energy* 's dictum cannot be said to indicate that the statute is jurisdictional. Although the alleged infringer argued that the statute both afforded it immunity and deprived the district court of jurisdiction, we treated only the former contention: "The *sole* issue before us is whether a private party which infringes another's patent during Government bidding activities such as those present here is *immune* under 28 U.S.C. § 1498 from a District Court infringement action for that test demonstration." *Id.* at 1059, 1 USPQ2d at 1072 (emphasis added). In any event, the dictum in *TVI Energy* cannot control here since it is inconsistent with the Supreme Court's holding in *Sperry*.

8. Even if the section 1498 defense had been raised at the appropriate time, the district court need not necessarily have dismissed the lawsuit: It could properly have entertained a timely motion to add the government as a party and transfer the case to the Claims Court.

made an error of law, or a clear error of judgment, or made findings which were clearly erroneous.'" *Id.* (quoting *Seattle Box Co. v. Industrial Crating and Packing, Inc.*, 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985)).

### A. Lost Profits

 Manville presented evidence that it lost profits of $2,414,159.37 due to Paramount's infringing sales. This figure was derived from calculations by John Wieder, Manville's sales negotiator. Wieder estimated the prices that Manville would have offered on several contract solicitations that Paramount was awarded, and for which Paramount used its infringing device. These prices, however, were estimates on what prices Manville would have offered had Paramount not been in the market with its infringing device. Wieder testified that these prices were based on his experiences with the same type of jobs prior to Paramount entering the market, as well as input from the salesmen involved on those contract negotiations. However, no supporting documentation was provided to explain the method or basis of estimating the prices for each of the contracts in such a hypothetical market.

From these price estimates, Wieder deducted the direct costs that would have been incurred to derive the lost profits from each contract. The sum of these lost profits made up the $2,414,159.37 Manville sought. The district court reduced that figure by five percent to cover sales commissions Manville would have had to pay, and then determined that Manville's lost profits were one half that figure, or $1,146,725.70. Manville asserts that the court abused its discretion in not awarding Manville $2,293,451.40.

The district court was in a position to assess the credibility of Wieder who made the market price estimates critical to Manville's lost profits calculations. Moreover, there was evidence that Paramount and Manville were not the only competitors in their market, and thus other companies might have received some of the contracts.

We therefore cannot say the district court abused its discretion in finding lost profits less than those asserted by Manville. Accordingly, we affirm the district court's decision as to the quantum of damages for lost profits.

### B. Reduced Profits

 Manville also sought reduced profits from contracts it received but for which it claims it took reduced profits in order to compete with Paramount's infringing devices. Manville provided price estimates it considered representative of what it would have quoted absent infringing competition from Paramount. These estimates were based on the same factors used for Manville's lost profits price estimates, as described *supra*.

Because no explicit findings concerning reduced profits were contained in the district court's decision, Manville filed a Motion to Amend the Judgment. That motion was denied by the district court because the court concluded that Manville had not proven reduced profits by a preponderance of the evidence. The district court was in a unique position to assess Wieder's credibility, which was critical to whether the price estimates were reasonable, especially because no supporting documentation was provided to justify Manville's estimates. We therefore cannot say the district court abused its discretion. Thus, we affirm the district court's decision not to award reduced profits.

### COSTS

The parties will each bear their own costs.

AFFIRMED–IN–PART AND RE-VERSED–IN–PART.