**Walter WILLIAMS, Dreamsite Productions, Inc., Plaintiffs,**

v.

**COLUMBIA BROADCASTING SYSTEMS, INC., Defendant.**

**No. SA CV 99–41 DOC(ANx).**

United States District Court, C.D. California.

July 7, 1999.

---

**964**

Edward A. Ruttenberg, Leopold Petrich & Smith, Los Angeles, CA, for Walter Williams and Dreamsite Productions, Inc., plaintiffs.

John Michael Gatti, Jonathan David Avila, Frederick F. Mumm, White O'Connor Curry Gatti & Avanzado, Los Angeles, CA, for Columbia Broadcasting System, Inc., defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR DISMISSAL AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CARTER, District Judge.

This matter is before the Court on two motions brought by Defendant. First, Defendant moves to dismiss pursuant to Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, for summary judgment. Second, Defendant moves for summary judgment or, in the alternative, summary adjudication. Having fully considered the moving and responding papers and oral argument, the Court denies the first motion and grants the second motion.

### I. Facts

Plaintiffs own the copyright to "Mr. Bill," a popular character from the late 1970s that debuted on NBC's "Saturday Night Live" and has recently resurfaced on the FOX Family Channel. Mr. Bill, a funny looking clay figure, was famous for getting into accidents that would seemingly destroy or disfigure the character and for his famous moniker "ohhhhh nooooo!" Fortunately, since Mr. Bill was made of clay, he was never seriously hurt, and can continue to amuse American television viewers.

Defendant CBS is a national television network which has a contract to televise the annual football games between the United States Military Academy and the United States Naval Academy (the "Army/Navy Game"). During the course of the Army/Navy Game, CBS broadcasts "spirit messages" sent in by cadets at the academies or American troops throughout the world in support of their respective service branch.. These messages, under thirty seconds in length, are solicited by the Public Affairs Offices of the academies months before the game. They are then produced by individual units and sent into the academies for review and forwarding to CBS. CBS then selects a small number of these messages to broadcast.

Toward the end of the 1997 Army/Navy Game, CBS broadcast a 23 second message entitled "Sailor Bill Joins the Army" (the "Segment"). This message, produced by soldiers in the Light Fighters of the 25th Infantry Division at Schofield Barracks, Hawaii, depicted a clay figure, similar to Mr. Bill, wearing what appears to be a U.S. Navy jumpsuit with the name "Navy" on its chest, and a white sailor hat. "Sailor Bill" was apparently intended to depict a Navy Seaman undergoing army training. Predictably, Sailor Bill befell a horrible fate as he was dropped from a helicopter, run over by a tank, and then riddled with machine gun bullets. At the conclusion of the Segment, the troops shout "Go Army, Beat Navy!" Plaintiff Williams did not see the Segment when it aired. Indeed, Williams first viewed the Segment approximately one year later,

and only after having learned of it from his friend Matt Neuman.

Plaintiffs commenced this action against CBS for copyright and trademark infringement, claiming that Sailor Bill infringed upon their ownership of Mr. Bill, and that CBS, without Plaintiffs' permission, used the character for commercial purposes.

## II. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

In this motion, Defendant contends that it was acting "with the authorization or consent of the Government" in broadcasting the segment, and as such, jurisdiction of this matter is vested exclusively in the United States Court of Federal Claims pursuant to 28 U.S.C. § 1498(b) [1]. Defendant moves to dismiss for lack of subject matter jurisdiction, or in the alternative for summary judgment based on 28 U.S.C. § 1498(b).

The United States Court of Appeals for the Federal Circuit held in *Manville Sales Corp. v. Paramount Systems Inc.*, 917 F.2d 544, 555 (Fed.Cir.1990), that 28 U.S.C. § 1498(a) provides contractors with the Federal Government an affirmative defense in patent infringement cases.[2] The Ninth Circuit precedent on section 1498, is a forty year old case not directly on point. In *Neff Instrument Corp. v. Cohu Electronics, Inc.*, 269 F.2d 668 (9th Cir.1959), the Ninth Circuit reversed the trial court's summary judgment order on the grounds that there were material facts as to whether the contractor was in fact acting as an agent of the United States. But the Court there did not address or consider the jurisdictional questions.

There is considerable disagreement among federal courts over the nature of section 1498, with a number of courts concluding that section 1498 is an issue of federal subject matter jurisdiction, and not merely an affirmative defense. *See e.g. Serra v. United States Gen. Services Admin.*, 667 F.Supp. 1042, 1051 (S.D.N.Y. 1987), *aff'd* 847 F.2d 1045, 1051 (2d Cir. 1988); *Fulmer v. United States*, 83 F.Supp. 137, 142 (N.D.Ala.1949).

A trend that emerges upon examination of this split of authority is that courts treating the issue as jurisdictional tend to do so in the context of cases where the United States or one of its agencies (e.g., the General Services Administration) is the defendant, whereas courts that conclude that section 1498 merely gives rise to an affirmative defense do so in cases where a private party is the defendant. *Compare Fulmer*, 83 F.Supp. 137 with *Manville*, 917 F.2d 544. While Defendant does point to one case, *Croydon Co., Inc. v. Unique Furnishings, Ltd.*, 831 F.Supp. 480, 485 (E.D.N.C.1993), the general trend is in accord with the Federal Circuit's statement in *Manville* that there is:

> "no inconsistency between interpreting section 1498(a) as a jurisdictional statute (waiving sovereign immunity) in suits against the United States and as merely codifying a defense that private parties who are alleged infringers may raise on the merits. That two different effects occur depending on the party raising section 1498(a) is the clear implication of *Sperry [Gyroscope Co. v. Arma Engineering Co.*, 271 U.S. 232, 46 S.Ct. 505], 70 L.Ed. 922 and the other cases, read together."

1. 28 U.S.C. § 1498(b) states in relevant part: whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims....

2. Section 1498(a) deals with patent claims and is the counterpart to subsection (b), which deals with copyright claims.

917 F.2d at 555. The same reasoning should apply to section 1498(b), the counterpart to subsection (a) dealing with copyright infringement. Although it is peculiar for a statute to have different effects depending on the party, the position is a logical approach for the Court to adopt. Since section 1498 acts as a waiver of sovereign immunity so long as the suit is commenced within the Court of Federal Claims, *see Zimmerman v. United States,* 422 F.2d 326, 327 (3d Cir.1970), a district court would not have subject matter jurisdiction in a copyright infringement case where the United States is a defendant. But where a private party is a defendant, section 1498 does not lend itself to determination on a jurisdictional motion. As the instant case suggests, the Court must make a factual determination—whether the contractor was acting "with the authorization or consent of the Government." Such a factual determination, unnecessary when the United States is the defendant, is appropriate only by trial or on a motion for summary judgment. This position is also consistent with the Supreme Court's decision in *Richmond Screw Anchor v. United States,* 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303 (1928), where the Court found that section 1498 was meant "to relieve the contractor entirely from liability of every kind. . . . The word 'entire' emphasizes the exclusive and comprehensive character of the remedy." Regardless of whether section 1498 provides merely an affirmative defense or is a question of jurisdiction, a copyright owner will only be able to recover against the United States in the Court of Federal Claims.

Finally, the decisions that treat section 1498 as jurisdictional in suits against private parties, although well reasoned, do not carry the same authority as the decision by the Federal Circuit. If this were a matter for patent infringement, the determination by the Federal Circuit on subsection (a) would be binding on this Court, as the Federal Circuit has jurisdiction over all appeals from patent disputes. *See* 28 U.S.C. § 1295. Although this is a copy-

right dispute allegedly under subsection (b), over which the Ninth Circuit would have appellate jurisdiction, the similarity of the two provisions guides this Court's decision. Both subsections (a) and (b) of section 1498 are intended to serve the same purpose—to protect contractors of the federal government by providing that the only relief that may be granted is against the government in the Court of Federal Claims. The language in each statute is nearly identical. Thus, it would seem impossible to determine that subsection (b) raises an issue of jurisdiction, a fundamental question which goes to the power of the courts and may be raised at any time during the course of the litigation, even after a final judgment has been issued, while subsection (a) raises only an affirmative defense which a defendant waives if it fails to plead it. Therefore, 28 U.S.C. § 1498(b) must be considered an affirmative defense, and therefore dismissal under Fed.R.Civ.P. 12(b)(1) is improper.

■ In this instance, summary judgment is also improper. As Plaintiffs point out, Defendant has not plead section 1498(b) as an affirmative defense. Normally, the failure to plead an affirmative defense acts as a waiver, although Ninth Circuit has in some instances allowed the introduction of an affirmative defense on a motion for summary judgement when there is no prejudice to the opposing party. *See e.g. Ledo Fin. Corp. v. Summers,* 122 F.3d 825, 827 (9th Cir.1997).

■ Assuming *arguendo* that there is no prejudice to Plaintiffs, Defendant has not shown as a matter of law that it was acting "with the authorization or consent of the Government." Defendant contends that it was obligated to include spirit messages as part of its "understanding" with the military academies. But this agreement, collateral in nature, is nowhere to be found in the written contract. Such evidence of a collateral agreement is barred by the Parol Evidence Rule. *See Baggett Transportation Co. v. United States,* 162

Ct.Cl. 570, 319 F.2d 864, 868 (Ct.Cl.1963). The written agreement includes, in section 17 of the Terms and Conditions, an integration clause which states that: "This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated orally." Further, the alleged understanding that Defendant was required to broadcast the spirit messages directly contradicts at least two other provisions of the contract. Article IV of the Agreement gives Defendant "the right to determine the format of its broadcasts of the games under this Agreement." Section 5(a) of the Terms and Conditions of the Agreement states in relevant part: "Nothing herein contained shall be deemed to obligate CBS to broadcast the Event [the Army/Navy Game] in whole or in part and CBS shall have fulfilled all its obligations to Licensor [the academies] by payment of such sums as shall actually become due pursuant to paragraph II." Therefore, the Parol Evidence Rule prevents Defendant from introducing evidence of additional obligations which it expressly disclaimed in the written contract. *Id.*

■ Finally, even if the Court allowed Defendant to show that it was obligated under its contract with the academies to broadcast spirit messages, there would exist a genuine issue of material fact whether the broadcasting of the Segment was authorized by the Army. Plaintiffs present a letter from Lt. Col. William F. Condron, Jr. of the Judge Advocate General's Office which states that the Army did not forward the Segment to CBS, but had in fact received and rejected the video. Defendant objects to this evidence as inadmissible hearsay, but such evidence is admissible under the Federal Rules. "At the summary judgment stage, 'the non-moving party need not produce evidence in a form that would be admissible at trial,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265, but the content or substance of the evidence must be admissible...." *Hardy v. S.F. Phosphates*

*Ltd. Co.*, 185 F.3d 1076, n. 5 (10th Cir. 1999). Since the substance of Lt. Col. Condron's letter would be admissible at trial through his testimony, the Court overrules Defendant's objections. Thus, Plaintiffs have introduced sufficient evidence to create a genuine issue of material fact whether Defendant was acting "with the authorization or consent of the Government." If the Army had, as Lt. Col. Condron states, received and rejected the video, CBS could not have been acting with the Army's consent in broadcasting it.

Accordingly, Defendant's Motion to dismiss for lack of subject matter jurisdiction or in the alternative for summary judgment based on 28 U.S.C. § 1498(b) is DENIED.

## III. Defendant's Motion for Summary Judgment

### A. Legal Standard

Defendant moves for summary judgment or in the alternative summary adjudication for each of Plaintiffs' three causes of action. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, the existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgement; to defeat the motion, the non-moving party must affirmatively set forth facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absences of evidence of a genuine issue of material fact from the non-moving party. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The moving party need not disprove the other party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. *Id.*

### B. Analysis

#### 1. Plaintiffs' Copyright Infringement Claim

■ Plaintiffs' first cause of action is a copyright infringement claim. Defendant argues that its use, if any, of Mr. Bill does not infringe on Plaintiffs' copyright because the Segment was a parody, and thus protected under the Fair Use Doctrine. *See* 17 U.S.C. § 107. Plaintiffs argue that such a determination is improper on a motion for summary judgment because the fair use analysis is fact-intensive. Plaintiffs are correct that a fair use determination is a case specific endeavor. *See Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994). But such a determination is appropriate on summary judgment as the question of fair use is a mixed question of law and fact. *See Fisher v. Dees,* 794 F.2d 432, 436 (9th Cir.1986) *citing Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). As long

as Defendant can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, summary judgment may be granted. *See* Fed.R.Civ.P. 56.

The Fair Use Doctrine is a judicially created rule of equity which allows Courts to avoid the rigidity of the copyright laws. *See Iowa State University Research Foundation v. American Broadcasting Companies, Inc.,* 621 F.2d 57, 60 (2d Cir.1980). First enunciated by Justice Story in *Folsom v. Marsh,* 9 F.Cas. 342 (C.C.D.Mass. 1841), the Fair Use Doctrine has evolved over time to become one of the most troublesome rules of copyright law. *See Dellar v. Samuel Goldwyn, Inc.,* 104 F.2d 661, 662 (2d Cir.1939). In 1976, Congress codified the Fair Use Doctrine as part of the Copyright Act of 1976. The Fair Use Doctrine allows individuals to use copyrighted works in certain circumstances, without infringing the copyright owners rights. Parody is one recognized allowable use, and Defendant's assert that its use of Mr. Bill was a parody.

■ Defendant's assertion that the Segment is parody is misplaced. In order for a parody to qualify as a fair use of a protected work, the original work must be the object of the parody. *See Fisher,* 794 F.2d at 436; *see also Campbell,* 510 U.S. at 597, 114 S.Ct. at 1180 (Kennedy, J. concurring). A parody does not gain protection of the Fair Use Doctrine if it merely uses the protected work as a means to ridicule another object. *See Campbell,* 510 U.S. at 580, 114 S.Ct. at 1172. In this case, the Segment is unquestionably intended as a good natured jibe of the Navy and its personnel. As Defendant has explained, the purpose of the spirit messages was to allow members of each service branch to express their support for their respective academy. No argument is advanced by CBS, nor could one reasonably be accepted by a jury, that the object of ridicule is the generally hapless Mr. Bill. Although the Segment does show Sailor Bill being obli-

terated in a number of ways intended to be comical, it is part of Mr. Bill's "shtick" to be the unfortunate object of similar misfortune in civilian life. The exploits of Sailor Bill do not poke fun at Mr. Bill, but merely copy his antics. Therefore, the Sailor Bill Segment falls into the category of satire, not parody. *See Campbell,* 510 U.S. at 581 n. 15, 114 S.Ct. at 1172 n. 15.

The absence of parody, however, does not end the fair use inquiry. The Copyright Act of 1976 as amended (17 U.S.C. § 101 *et seq.*) codified the judicially created Fair Use Doctrine:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

■ 17 U.S.C. § 107. All four of these non-exclusive factors must be explored, and each factor balanced against each other to determine whether the Segment constitutes a fair use. *See Campbell,* 510 U.S. at 578, 114 S.Ct. at 1171.

■ The first factor to consider is the nature of the work. If the work is commercial, then this factor tends to weigh against finding a fair use. *See Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985). But the fact that the work is commercial does not prevent a finding of fair use. *See Fisher,* 794 F.2d at 437. In the instant case, the use of Mr. Bill in the Sailor Bill Segment was a mix of commercial and non-commercial uses. Defendant benefitted from showing the Segment in at least two ways. It endeared

itself to the academies for showing the spirit messages, and by choosing the ones that it found most entertaining, it hoped to reap rewards by higher ratings for the Army/Navy Game. But there is also a distinct non-commercial aspect to the Segment. The message was produced by the Light Fighters of the 25th Infantry Division for fun and with no eye toward financial gain. Moreover, the spirit messages are a unique aspect of the Army/Navy Game. Such spirit messages are not broadcast during the course of other major college football games. They are unique to the Army/Navy Game in order to give American troops who are serving our country throughout the world an opportunity to be involved, even remotely, in this friendly rivalry. Since the use of the Segment is a mixed use, it weighs less toward a fair use then would a purely nonprofit use, but much more so than would a commercial use.

■ The second factor is the nature of the copyrighted work. Where a copyrighted work is one of fiction or fancy, it deserves more protection under a fair use analysis than would a factual work. *See Stewart v. Abend,* 495 U.S. 207, 237, 110 S.Ct. 1750, 1769, 109 L.Ed.2d 184 (1990). Mr. Bill is clearly a fictional work, more deserving of protection than a scholarly, historical or newsworthy works. *Compare Stewart,* 495 U.S. at 237, 110 S.Ct. at 1769 (giving greater protection to a comic book story on which the movie "Rear Window" was based) *with Harper & Row,* 471 U.S. at 563, 105 S.Ct. at 2232 (affording lesser protection to the autobiographical memoirs of President Gerald Ford).

■ The third factor to consider is the amount of the copyrighted work used in the Segment. As long as the new work does not take more from the original work than is necessary to accomplish its purpose, this factor does not weigh against a determination of fair use. *See Fisher,* 794 F.2d at 439. As both parties acknowledge, the Segment used only a small part of the

copyrighted work.[3] Sailor Bill was a clay figure in a military uniform. Mr. Bill always wears his usual red shirt and blue pants. Although Sailor Bill suffered horrible fates similar to Mr. Bill and called out his famous moniker "ohhhh, nooooo!" the Segment did not use several of the related elements. Neither Mr. Bill's friends Spot and Ms. Sally nor his tormentors Mr. Hands and Sluggo, were to be found in the Sailor Bill Segment. The Segment was a crude imitation, which as Plaintiff admits did not follow many of the traditional formulas for Mr. Bill sketches. In this case, the small amount of the protected work used in the Segment is only enough to "conjure up" the original work, and thus does not weigh against determining a fair use. *Id.*

■ The fourth and final factor that must be considered is what effect the Segment had on the market for and value of Mr. Bill. The concern in this factor is whether the new work, i.e., Sailor Bill, serves to supplant the original in the market, *see Fisher*, 794 F.2d at 438, or if the new work competes against the original work, *see Los Angeles News Serv. v. KCAL–TV Channel 9*, 108 F.3d 1119, 1123 (9th Cir.1997) *cert. denied* — U.S. ——, 118 S.Ct. 81, 139 L.Ed.2d 39 (1997). Defendant contends that Sailor Bill did not in any way compete with Mr. Bill for any market share of spirit messages during the Army/Navy Game. But Plaintiffs counter that Defendant is construing the term market too narrowly, and that the Segment directly competes with Mr. Bill on television, Mr. Bill's primary market. In either case, the twenty-three second spirit message, produced by an army infantry unit, which aired once, poses little danger of competing with or supplanting in the market the widely known and slickly produced Mr. Bill.

■ Plaintiffs accurately point out that the question of market harm is "whether unrestricted and wide-spread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market." *Campbell*, 510 U.S. at 589, 114 S.Ct. at 1177 (citations omitted). They argue that widespread network broadcasts of Mr. Bill imitators would damage the potential market value for the clay figure. But it is unlikely that widespread broadcasts of Sailor Bill sketches, of rather low quality, produced by army units, would have any noticeable affect on the market or value for Mr. Bill. This point is supported by the fact that Plaintiffs cannot point to any damage done to the value of Mr. Bill in the nineteen months since the Sailor Bill Segment aired. Finally, the Segment has only aired once, and has not been widely distributed. Therefore, the Sailor Bill Segment has a negligible, if any, effect on the market or value of Mr. Bill.

As noted above, the purpose of the Fair Use Doctrine is to avoid the rigidity of the Copyright Act. *See Stewart*, 495 U.S. at 236, 110 S.Ct. at 1768. In this case, where there was an isolated production of a humorous skit created by a group of spirited soldiers, the Fair Use Doctrine should apply. The mixed non-commercial use of the Mr. Bill works, and the negligible economic affect far outweigh the extra protection that is afforded to a creation of fancy. In *Campbell*, the Supreme Court stated that;

when there is little risk of market substitution, whether because of the large extent of transformation of the earlier work, the new work's minimal distribution in the market, the small extent to which it borrows from an original, or other factors, taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use, as may satire with lesser justification for bor-

---

**3.** Defendant contends that the Segment used none of the copyrighted work, as Sailor Bill had only a "passing similarity" to Mr. Bill and the names and expressions were in com-

mon use. But the Court's opinion is based on the reasonable inference that the Sailor Bill Segment did use the Mr. Bill work. *See* Fed. R.Civ.P 56.

rowing than would otherwise be required.

510 U.S. at 581 n. 14, 114 S.Ct. at 1172 n. 14. That analysis is directly on point with the instant case. After balancing the statutory factors set forth in section 107, and the equitable nature of the Fair Use Doctrine, the Court concludes that Defendant's use of the copyrighted work of Mr. Bill was a fair use, and thus not an infringement of Plaintiffs' copyright.

### 2. Plaintiffs' Trademark Claims

Plaintiffs' second and third causes of action are for trademark infringement and unfair competition under the Lanham Act. "When trademark and unfair competition claims are based on the same infringing conduct, courts apply the same analysis to both claims." *Toho Co., Ltd. v. William Morrow and Co.*, Inc., 33 F.Supp.2d 1206, 1210 (C.D.Cal.1998) *citing E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 n. 2 (9th Cir.1992). In the present case, Plaintiffs' claims both stem from the twenty-three second broadcast of the Segment, and therefore the same analysis applies to both claims. In order to succeed on their claims, Plaintiffs must prove that they (1) owned the trademark at issue, which (2) Defendant used, or used a copy or imitation of without Plaintiffs' authorization, (3) in connection with the sale of goods and services, (4) in a manner likely to cause confusion. *Id.* Defendant's arguments that Plaintiffs did not have a valid mark and that Sailor Bill was not a copy or imitation of Mr. Bill are not relevant in light of this Court's finding that Plaintiffs do not make out the third or fourth elements.

With regard to the third element, Plaintiffs have not been able to show that the Segment was used in connection with the sale of goods or services. Plaintiffs contend that Defendant used Sailor Bill to promote its television broadcasts, its on-line entertainment service, and the United States Army. As discussed above, the use of Sailor Bill in connection with the Army was a non-commercial use. There was no attempt by the Light Fighters of the 25th Infantry Division to promote the Military Academy or their unit for commercial gain. Plaintiffs argument that the Segment was used to promote CBS' on-line service is without merit. Merely because the advertisement for the on-line service preceded the Segment does not show that the Segment was used to promote CBS' on-line service. A commercial for Coca–Cola which follows immediately after a Pepsi commercial, as might happen during broadcasts of major football games, does not show that Coca–Cola is endorsing Pepsi.

Plaintiffs' remaining contention is that Defendant's use of Mr. Bill was commercial because it reaped economic benefits from broadcasting the Army/Navy Game. Generally, a trademark infringement action lies where one party "passes off" its own goods or services as the goods or services of the trademark holder. *See Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328–329 (6th Cir.1973). The purpose of trademark protection is to prevent consumers from being lulled into buying products based on the belief that they are provided or endorsed by the trademark owner. *Id.* In light of this purpose, Plaintiffs' claim that CBS used its trademark to bolster the success of its television broadcast cannot be sustained. Plaintiffs go so far to argue in their opposition that:

> The Mr. Bill Marks were tarnished by their usurpation in a cheap and shoddy production that was designed to glorify grotesque violence dissonant from Mr. Bill's image and reputation, and that also implied an association of Mr. Bill as a mortal enemy, deserving of slaughter by the U.S. Army.

Plaintiffs submit four video collections of Mr. Bill's skits that undermine their contention that Mr. Bill's image and reputation are "dissonant" from "grotesque vio-

**972**

lence."[4] Defendant did not imply that Mr. Bill endorsed the CBS broadcast of the Army/Navy Game. The only implication that might be culled from the Segment was that a Navy seaman would wilt under the rigors of Army training.[5] Therefore, Plaintiffs' claim that the Sailor Bill Segment was used for commercial promotion must fail.

The fourth element of a trademark infringement and unfair competition claim is the likelihood of causing confusion. Although this inquiry is, as Plaintiffs point out, especially fact intensive, a determination of the question is appropriate on summary judgment as long as there is no evidence upon which a jury could reasonably find for Plaintiffs. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. Here, no evidence exists to show that any reasonable jury could find that consumers are "likely to assume that [Sailor Bill] is associated with a source other than it actual source because of similarities between the two...." *Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir.1993). The Ninth Circuit has set out the following eight non-exclusive factors to consider in assisting a determination of whether there is any likelihood of confusion;

1. strength of the mark;
2. proximity of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. type of goods and the degree of care likely to be exercised by the purchaser;
7. defendant's intent in selecting the mark; and
8. likelihood of expansion of the product lines.

*AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–349 (9th Cir.1979). Although the strength of the mark, the proximity of the goods, the similarity of the marks, and the marketing channels used weigh in favor of possible confusion, all of the other enumerated factors, and the unequivocal attribution of the Segment as a spirit message sent by the Light Fighters of the 25th Infantry Division, show that there is no likelihood of confusion.

In the instant case, the Court deems the sixth and eight factors the most significant in determining whether there was a likelihood of confusion. Here, no goods are being endorsed or sold by Sailor Bill, and thus no expansion of a product line is possible. Further, Plaintiff submits scant evidence of any actual confusion by the public. As to Defendant's intent in using Sailor Bill, Plaintiffs also argue that Defendant had the intent "of causing public association with Mr. Bill...." But this argument ignores the fact that Defendant did not produce the Segment, and that the obvious intent of the "producers," the Light Fighters of the 25th Infantry Division, was to give support to the Army's football team.

In sum, the totality of the circumstances shows that there is little, if any, likelihood

---

**4.** The Court viewed (1) *The Best of Saturday Night Live, the Mr. Bill Collection;* (2) *Mr. Bill Looks Back;* (3) *It's Mr. Bill's Christmas Special!;* and (4) *It's Mr. Bill's 20th Anniversary.* In these tapes, Mr. Bill and his loyal friend Spot are repeatedly maimed, decapitated, and squashed by their so-called friends, Mr. Hands and Sluggo. Notably, the types of harm inflicted in the Sailor Bill Segment are no more "grotesque" than those inflicted in these tapes. Indeed they are quite similar. For example, Mr. Bill is dropped from the observation deck of the Empire State Building, he is shot at by machine guns during an attempted jailbreak, and is run over by a car.

Additionally, Mr. Bill and Spot are decapitated, mutilated, flattened, impaled, torched, given electric shock treatment, crushed by bricks, and even swindled by an insurance salesman.

**5.** Plaintiffs' claim that the Sailor Bill Segment portrays "Mr. Bill as a mortal enemy, deserving of slaughter by the U.S. Army" is not relevant to this Court's inquiry. In any event, whether Mr. Bill is a national security threat is a more appropriate question for the Light Fighters of the 25th Infantry Division or the Secretary of Defense.

that the public was confused as to the origin or nature of Sailor Bill. As Plaintiff notes, the Segment is a crudely done video with a poorly put-together Sailor Bill. If the circumstances of the Army/Navy Game, and the amateur quality of the Sailor Bill Segment leaves any doubt, the entire Division stands at attention in front of the camera and yells out "Go Army, Beat Navy!" Any remaining doubt or possibility of confusion as to the source of the Sailor Bill Spirit Segment is swept away.

Because Plaintiffs have not established that there is a triable issue of fact under their claims for trademark infringement and unfair competition, the court GRANTS Defendant's motion for summary judgment.

## IV. Conclusion

For the foregoing reasons, the Court (1) DENIES Defendant's motion to dismiss or in the alternative for summary judgment and; (2) GRANTS Defendant's motion for summary judgment.

**IT IS SO ORDERED.**